## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | §§§ | |
| Plaintiff, | §§ | |
| v. | §§§ | CASE NO. 2:15-cv-2451-CJB-SS |
| RONALD L. BLACKBURN, ANDREW V. REID, BRUCE A. GWYN, MICHAEL A. MULSHINE, LEE C. SCHLESINGER, SAMUEL E. WHITLEY, AND TREATY ENERGY CORPORATION, | §§§§§§§ | |
| Defendants. | §§ | |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Ronald L. Blackburn, Andrew V. Reid, Bruce A. Gwyn, Michael A. Mulshine, Lee C. Schlesinger, Samuel E. Whitley, and Treaty Energy Corporation (collectively, "Defendants"), and alleges the following:

## I.
## SUMMARY

1.      Between 2009 and 2013, convicted felon Ronald Blackburn ("Blackburn") and his hand-selected team of associates worked in concert to manipulate trading in the stock of Treaty Energy Corporation ("Treaty"), a publicly traded oil and gas company, for their own benefit. During this period of time, Blackburn's team consisted of: (a) Andrew V. Reid ("Reid"), Treaty's Chief Executive Officer and Chairman of the Board; (b) Bruce A. Gwyn ("Gwyn"), Reid's co-CEO and, later, Treaty's Chief Operating Officer; (c) Michael A. Mulshine ("Mulshine"), Treaty's corporate secretary and investor relations consultant; (d) Lee C.

Schlesinger ("Schlesinger"), Treaty's Chief Investment Officer and a member of its Board of Directors; and (e) Samuel E. Whitley ("Whitley"), Treaty's outside corporate and securities counsel. Defendants carried out their scheme by:

- concealing the key fact that Blackburn, a convicted felon, controlled – and may continue to control – Treaty as a *de facto* officer and director;

- engaging in a fraudulent promotional campaign intended to artificially inflate Treaty's stock price that included the issuance of a January 2012 press release falsely claiming a major oil strike in Belize;

- perpetrating a fraudulent trading scheme involving the issuance and transfer of restricted and unrestricted Treaty stock, through which Treaty and its officers – with the aid of outside securities counsel – raised millions of dollars selling virtually worthless Treaty stock to unwitting investors; and

- conducting an illegal and unregistered offering of oil and gas working interests.

2.     As a result of their misconduct, Defendants raised approximately $4.9 million through the sale of Treaty stock ($3.6 million), overriding royalty interests on Treaty's Texas leases ($750,000), and working interests in a single Texas lease ($565,000), while at the same time generating almost no revenue for Treaty and, instead, causing the company to incur significant losses.

3.     Consequently, Treaty, Blackburn, Reid, Gwyn, Schlesinger, and Mulshine should be permanently enjoined from future violations of the antifraud, registration, and reporting provisions of the federal securities laws and, further, Whitley should be permanently enjoined from violating the registration provisions of the Securities Act of 1933 ("Securities Act"). Moreover, Blackburn, Reid, Gwyn, Schlesinger, and Mulshine should be permanently barred from serving as an officer or director of any public company, while all Defendants should be permanently barred from engaging in any activity related to the purchase or sale of a penny stock. In addition, Whitley should be permanently enjoined from (a) providing legal services to

any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an

exemption from the registration provisions of the Securities Act; and (b) providing legal services

to any person or entity in connection with filing Form S-8 with the Commission. Finally,

Defendants should be ordered to disgorge their ill-gotten gains and pay civil money penalties.

## II.
## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Securities and

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa] because Defendants

directly or indirectly made use of the means or instrumentalities of commerce and/or the mails in

connection with the transactions described herein.

5.      Venue is proper in this judicial district under Section 22(a) of the Securities Act

[15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of

Defendants' acts, practices, transactions, and courses of business alleged herein occurred within

this judicial district.

## III.
## PARTIES

6.      Treaty is a Nevada corporation located and operating in New Orleans, Louisiana

that claims (a) to be in the business of acquiring oil and gas properties; and (b) to own oil and gas

lease interests in Texas and Belize.  Treaty is a publicly traded company registered with the

Commission under Section 12(g) of the Securities Act.  Its common stock (ticker symbol

"TECO") was previously quoted on the OTC Bulletin Board and currently trades on the OTC

Link, operated by OTC Markets Group, Inc.  Between 2009 and 2013, Treaty's shares were

offered and purchased in private transactions and also sold in the public markets.  Blackburn,

Reid, Gwyn, Mulshine, and Schlesinger communicated with Treaty investors and were directly involved in the sale of Treaty securities. On November 11, 2014, Treaty announced a decision to change the company's name to Trimerica Energy Corporation.

7.      Blackburn, age 68, resides in New Orleans, Louisiana. Since 2009, Blackburn and his associates – co-Defendants herein – carried out a scheme to manipulate Treaty's stock price and trading in Treaty stock, for their own benefit and while concealing Blackburn's control over Treaty as an undisclosed *de facto* officer and director. Blackburn asserted his Fifth Amendment privilege against self-incrimination and refused to testify in connection with the Commission's underlying investigation.

8.      Reid, age 45, resides in New Orleans, Louisiana. Reid served as Treaty's CEO and Chairman of the Board from April 2010 until he resigned from the company and its Board of Directors on July 28, 2014. Reid also exercised his Fifth Amendment privilege against self-incrimination in refusing to testify in connection with the Commission's underlying investigation.

9.      Gwyn, age 54, resides in New Orleans, Louisiana. Gwyn acted in several capacities during his tenure with Treaty: (1) he served alongside Reid as Treaty's co-CEO between November 2011 and January 2013; (2) he served as Chief Operating Officer from January 2013 through March 2014; (3) and was a director of the company from April 2011 to March 2014. Gwyn resigned from Treaty on March 14, 2014.

10.     Mulshine, age 75, resides in Brielle, New Jersey and has served as Treaty's corporate secretary since April 2010, a position he continues to hold. In addition, Mulshine served as a purported investor relations consultant for Treaty from May 2008 to September 2012.

11.     Schlesinger, age 45, resides in New Orleans, Louisiana.  From May 2011 –
November 2011, Schlesinger served as a consultant who sold shares on Treaty's behalf.  From
November 2011 until his resignation in September 2013, Schlesinger served as Treaty's Chief
Investment Officer ("CIO").   In addition to his role as CIO, Schlesinger served as Treaty's
investor relations point of contact between October 2012 and January 2013, and as a member of
Treaty's Board of Directors during his entire tenure. He signed Treaty's annual filings on SEC
Form 10-Ks in 2011 and 2012, and he signed Treaty's Form S-8 filings in 2012 and 2013.  By
signing the filings in his capacity as a director, Schlesinger certified to their accuracy and
completeness.

12.     Whitley, age 38, resides in Houston, Texas.  Whitley has been a member of the
State Bar of Texas since 2001.  Between July 2009 and July 2013, he served as Treaty's outside
corporate and securities counsel, during which time he authored more than 100 opinion letters
concerning the tradability of Treaty's stock.  Whitley is the managing partner of Houston, Texas
law firm Whitley, LLP, through which firm he purports to serve as corporate and securities
counsel to publicly traded companies and investment companies.

## IV.
## FACTS

### A.   BLACKBURN ENGAGES IN CRIMINAL OR HIGHLY SUSPICIOUS CONDUCT BEFORE AND AFTER FORMING TREATY.

13.     Blackburn was convicted of federal income tax evasion in 1999, for which he was
incarcerated between November 1999 and August 2002.

14.     Blackburn later formed Treaty in December 2008 through a reverse-merger of a
private oil and gas company with a dormant public shell.  Treaty, which purports to be in the

business of acquiring oil and gas properties for investment, is a public company whose common stock is registered with the Commission under Section 12(g) of the Securities Act.

15.    In or around January 2009, Treaty's common stock – 86% of which Blackburn controlled – began trading on the OTC Bulletin Board under the ticker symbol "TECO." Treaty's common stock has always traded at less than one dollar as a "penny stock."  As Treaty itself publicly acknowledges, the market for its penny stock is thin and, therefore, the price per share can be subject to wide fluctuations as a result of a single investor's trading activity.

16.    When he formed Treaty, Blackburn also controlled Phoenix Associates Land Syndicate, Inc. ("Phoenix Associates").  One year after he formed Treaty, in December 2009, the Chapter 7 bankruptcy trustee for *In re Phoenix Associates Land Syndicate, Inc.* sued Blackburn to recover nearly $2 million in fraudulent transfers paid to him while he served as the company's Chief Operating Officer.  Blackburn agreed to a final judgment in that action under which he agreed to pay the trustee $1,300,000.  The Commission temporarily suspended trading in the stock of Phoenix Associates in February 2014 based on concerns about the accuracy and adequacy of publicly disseminated information concerning its operating status.

17.    On or around June 28, 2010, Blackburn gained control of another publicly traded company, Orpheum Property, Inc.

**B.    BLACKBURN OPERATES BEHIND THE SCENES TO HIRE TREATY'S SECURITIES COUNSEL, AND APPOINT OFFICERS AND DIRECTORS, OF HIS CHOOSING.**

18.    Given his background, Blackburn held no formal title at Treaty, and instead operated behind the scenes as a purported consultant.  In reality, Blackburn controlled nearly all aspects of Treaty's day-to-day operations between July 2009 and September 2013.

19.     For instance, in or around July 2009, Blackburn was present and participated in hiring Whitley to serve as Treaty's corporate and securities counsel, which role Whitley filled until July 2013.

20.     Soon thereafter, beginning in or around September 2009 and through April 2010, Blackburn appointed two consecutive Chief Executive Officers ("CEO") until finally appointing Reid to the position in April 2010.  Reid served as Treaty's CEO, as well as Chairman of the Board, from his appointment in April 2010 until his resignation on July 28, 2014.  On July 15, 2014, the Financial Industry Regulatory Authority, Inc. ("FINRA") permanently barred Reid from associating, in any capacity, with any National Association of Securities Dealers ("NASD") member firm due to his misappropriation of client funds while employed as a registered representative at Williams Financial Group located in Dallas, Texas.

21.     In or around November 2011, Blackburn appointed Gwyn to serve as Treaty's co-CEO alongside Reid, which position he held until January 2013.  In addition, Gwyn served as Treaty's Chief Operating Officer ("COO") from January 2013 through March 2014 and was a Treaty director beginning in April 2011 and until his resignation from the company on March 14, 2014.  On February 13, 2014, the National Futures Association ("NFA") ordered Gwyn and his futures firms – Level III Management LLC and Level III Trading LLC – to withdraw from NFA membership based on Gwyn's willful provision of misleading information to the participants in Level III Trading Partners, LP ("Level III"), a pool operated by Level III Management LLC, by investing the pool's funds in Treaty securities instead of commodity futures contracts.  Currently, Level III is liquidating its assets through a Chapter 11 bankruptcy proceeding pending in the Eastern District of Louisiana and styled *In re Level III Trading Partners, LP*, No.13-12120.  On or about August 21, 2015, the State of Alabama, Baldwin County Circuit Court, indicted

Defendant Bruce Gwyn on three counts of securities fraud, one count of offering or selling securities without a license, and one count of acting as an unregistered investment adviser in connection with his role in Level III.

22.     In or around April 2010, Blackburn appointed Mulshine to act as Treaty's corporate secretary.

23.     In or around November 2011, Blackburn appointed Schlesinger to act as Treaty's Chief Investment Officer ("CIO"), which position Schlesinger held until he resigned from Treaty in September 2013.  Prior to being hired by Blackburn, Schlesinger was unemployed for over a year and in desperate financial straits.

**C.     UNDER BLACKBURN'S UNDISCLOSED CONTROL, TREATY MISREPRESENTS AND OMITS MATERIAL FACTS CONCERNING HIS CRITICAL ROLE IN THE COMPANY, HIS CRIMINAL BACKGROUND, AND THE TRUE NATURE OF THE COMPANY'S DRILLING OPERATIONS IN BELIZE.**

24.     Blackburn purported to act merely as a consultant for Treaty, even going so far as to execute a Consulting Agreement with the company in April 2010 whereby he agreed to provide enumerated services for the company, including coordinating with Treaty's executives to improve execution of its business plan.  In reality, Blackburn was only a consultant on paper and actually acted as a *de facto* officer of the company who directed its day-to-day operations from its 2008 formation through, at least, September 2013.

25.     Treaty, Blackburn, Reid, Gwyn, Schlesinger, and Mulshine (Reid, Gwyn, Schlesinger, and Mulshine collectively, the "Treaty Officers") (with Blackburn and the Treaty Officers collectively, "Treaty Defendants") have never disclosed Blackburn's control over the company despite the fact that Reid, Gwyn, Schlesinger, and Mulshine all knew that Blackburn:

     (a)     was Treaty's majority shareholder between January 2009 and early 2010 and continued to hold a substantial percentage of stock thereafter;

(b)     was paid nearly twice as much compensation as Reid, the next-highest paid Treaty officer;

(c)     worked in the same office as Reid, Gwyn, and Schlesinger in Treaty's New Orleans headquarters;

(d)     frequently communicated with Reid, Gwyn, Schlesinger, and Mulshine about day-to-day operations of the company;

(e)     directed Reid, Gwyn, Schlesinger, and Mulshine's work through in person, telephonic, and email communications;

(f)     oversaw a highly-touted oil and gas drilling program in Belize ("Belize Program"), for which he (i) served as Treaty's primary point of contact with the company's joint venture partner in the program; (ii) hired drilling personnel whom he instructed to report directly to him; and (iii) provided status reports and updates to Reid, Gwyn, Schlesinger, and Mulshine;

(g)     participated in selecting and working with Treaty's vendors and professional service providers, including hiring the Belize Program's drilling personnel and communicating with Treaty's auditor;

(h)     orchestrated sales and transfers of Treaty stock by soliciting investors and either arranging for Treaty to issue stock to them directly or, alternatively, selling them his own Treaty shares.  For example, after Blackburn told a prospective investor that Treaty's testing confirmed the presence of millions of barrels of oil in Belize, the investor purchased 4.6 million shares of Treaty restricted stock from the company for $120,000;

(i)     used proceeds from sales of his own Treaty stock – which funds were often commingled between Treaty's and Blackburn's bank accounts – to pay the company's expenses;

(j)     managed Treaty's funds and dictated how company money would be spent;

(k)     routinely negotiated loans on Treaty's behalf and personally guaranteed or pledged his own Treaty stock as collateral for certain loans; and

(l)     on numerous dates including, but not limited to October 19, 2009, April 22, 2010, September 12, 2011, October 3, 2011, March 29, 2012, and July 2, 2012, directed and approved the timing and content of key press releases published by Mulshine for Treaty.

26.   Despite his extensive involvement in nearly all facets of Treaty's operations, Treaty materially misrepresented and, in other instances, altogether omitted to disclose, in Forms 10-Q and 10-K, Blackburn's criminal history or connection to, and influence over, the company.

27.   Treaty's 2011 and 2012 Forms 10-K failed to disclose Blackburn's true role at the company and instead generically referred to him as a "major shareholder," "affiliate," or "related party." The Forms 10-K state, among other things, that:

(a)   "On April 13, 2010, we acquired 100% undivided working interest (82.5% royalty interest) in eight leases in Pickett County, Tennessee in exchange for 1.5 million shares which were contributed by a major shareholder;"[1]

(b)   "[O]n June 22, 2011, we issued an affiliate 77,258,753 shares as reimbursement for personal shares the affiliate used in various deals in Belize, Tennessee, Louisiana and Texas;" and

(c)   "On July 1, 2011 the Company acquired 20,000,000 shares of their previously issued shares from a related party for $790,000."

28.   Reid, Gwyn, and Schlesinger all knew the vague references listed above referred to Blackburn when they signed the 2011 and 2012 Forms 10-K as officers and/or directors of the company and authorized its filing, attesting to the completeness and accuracy of the content. For instance, Reid, Gwyn, and Schlesinger all knew Blackburn used his personal shares to finance Treaty's oil and gas acquisitions and that Treaty purchased 20,000,000 of its own shares from a company Blackburn owned.

29.   Likewise, Treaty misrepresented and failed to disclose Blackburn's presence and critical role with the company throughout quarterly reports filed on Forms 10-Q between September 2009 and September 2013. Like Treaty's other public filings, these quarterly reports repeatedly obfuscated Blackburn's involvement with the company, and altogether failed to identify him by name or to describe his role or criminal background, instead broadly referencing

---

[1] This statement also appears in Treaty's 2010 Form 10-K.

a "shareholder," " major shareholder," "affiliate," "consultant," and "related party." An actual or prospective Treaty investor reviewing the company's quarterly reports could not have known that its various references to a shareholder, affiliate, consultant or related party were in fact referencing a singular individual, much less that the individual was Blackburn.

30.     Reid signed each of Treaty's misleading Forms 10-Q and 10-K filed from the second quarter of 2010 through 2013. Gwyn and Schlesinger also signed Treaty's Forms 10-K for 2011 and 2012, certifying their accuracy and completeness. Further, Reid certified the accuracy and completeness of Treaty's:

    (a)     Second and third quarter Forms 10-Q for 2010;

    (b)     2010 Form 10-K;

    (c)     2011 Forms 10-Q;

    (d)     2011 Form 10-K;

    (e)     2012 Forms 10-Q;

    (f)     2012 Form 10-K; and

    (g)     First, second, and third quarter Forms 10-Q for 2013.

Gwyn also certified the accuracy and completeness of Treaty's 2011 Form 10-K. When Reid, Gwyn, and Schlesinger signed and certified each of those filings, they each knew the filings were incomplete, false, and misleading.

31.     As officers and directors of a public company, Reid, Gwyn, and Schlesinger owed fiduciary duties to the company and the shareholders to ensure that the filings they signed were complete and accurate.

32.     In addition to misrepresentations and omissions in their public reports filed with the Commission, Mulshine prepared, signed, and furnished to Treaty's transfer agent corporate

authorizations falsely stating that Blackburn's personal sales of stock were not on Treaty's behalf when, in fact, they were.  Mulshine did so to allow Blackburn to transfer his own shares that he sold directly to an investor, which action required corporate authorization.

33.     Similarly, certain broker-dealers would not accept the deposit of an investor's shares purchased directly from Blackburn without Treaty first certifying that he was not a company affiliate.   At Blackburn's direction, Mulshine prepared, signed, and furnished such corporate certifications falsely stating that Blackburn was not a Treaty affiliate when, in fact, he was.

34.     As a result of Treaty and the Treaty Defendants' misrepresentations and omissions in public reports filed with the Commission and numerous corporate authorizations and certifications between 2009 and 2013, Treaty obtained money from investors who purchased stock in the company, Reid, Gwyn, Mulshine, and Schlesinger received salaries, and along with Blackburn, received Treaty stock they later sold for profits.  And as a result of their misrepresentations and omissions, a reasonable investor or prospective investor reviewing Treaty's publicly filed reports between 2009 and 2013 could not know that Blackburn controlled the company, that he had a criminal conviction, or that the Belize Announcement, discussed *infra*, was completely false.  Consequently, actual and potential Treaty investors were deprived of material information affecting their investment decisions.

35.     By signing the public filings they knew to be false and incomplete, Reid, Gwyn, and Schlesinger knew, or were reckless in not knowing, that they were providing substantial assistance to Treaty in the issuance of public reports that misrepresented, failed to disclose, and omitted material information concerning the company and those operating it.

36.   Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger were motivated to conceal Blackburn's control of the company and maintain the Belize Announcement charade because they depended on the Treaty scheme for their livelihood. Each of them knew that Treaty's oil and gas operations were highly unprofitable and that the only way to make money was to sell Treaty stock. For instance, Schlesinger, who was unemployed for a year before he started earning commissions selling Treaty shares, was especially desperate to make a sale by any means possible. In January 2012, Schlesinger was only able to make his mortgage payment after Blackburn agreed to advance him $5,700 against future sales commissions.

**D.   TREATY AND THE TREATY DEFENDANTS ANNOUNCE AND TOUT A FICTIONAL OIL STRIKE IN BELIZE IN ORDER TO ARTIFICIALLY INFLATE TREATY'S STOCK PRICE AND TRADING VOLUME.**

37.   Through a joint venture agreement with another company, Treaty obtained drilling rights for the Belize Program in April 2010. As part of the agreement, Treaty contributed $100,000 to the joint venture in exchange for the right to drill exploratory wells and share in any potential profits. Treaty's $100,000 came from Blackburn's sale of 20 million of his own Treaty shares to a private investor, which fact was not disclosed to investors.

38.   Rather, Treaty's 2010 Form 10-K, which Reid signed and certified, and Treaty's 2011, and 2012 Forms 10-K, which Reid, Gwyn, and Schlesinger signed and certified stated only that: "On April 20, 2010, we entered into a 50/50 Joint Venture agreement with Princess Petroleum Limited, a company organized under the laws of Belize to explore for oil and gas on approximately 2 million acres in Belize . . . A major shareholder of the Company paid $100,000 cash as required under the agreement."

39.   The truth was, Blackburn was the major shareholder to whom Treaty's Forms 10-K referred, though an actual or prospective investor had no way of knowing that fact. Thus,

once again, investors could not know that Blackburn was the "major shareholder" to which the company referred, nor could they have known about his control over the company or his criminal history.

40.     As part of the Belize Program joint venture, Treaty was subject to oversight by the Department of Geology and Petroleum for the Government of Belize ("GOB"), the agency responsible for administration of Belize's petroleum sector.

41.     In April 2011, Treaty, Blackburn, Reid, and Mulshine each began making statements about the Belize Program that they knew, or were reckless in not knowing, were false.

42.     In July 18, 2011 and July 29, 2011 press releases published by Mulshine for Treaty, and for which Blackburn supplied the content, Treaty touted the Belize Program as a potential "magnificent life changer for all Treaty stakeholders and the people of Belize."  The company also claimed to know where the Belize hydrocarbons were located and that Treaty was preparing to implement a "drilling program to extract commercial grade quantities of oil in Belize."

43.     In the Fall of 2011, Treaty hired a stock promoter to post misleading or untrue information on internet message boards, such as investorshub.advfn.com and investorshangout.com regarding operations in the Belize Program, including false statements such as "I'll be there when she blows" and claiming that the company was on the verge of striking oil.  Such promotional efforts had the desired effect of inflating Treaty's stock price and volume between April 2011 and January 2012 by over 450% and 930 %, respectively.

44.     The hype surrounding the Belize Program culminated in a January 30, 2012 press release announcing that Treaty struck oil.  On January 31, 2012, Treaty filed the press release as an exhibit to a Form 8-K that Mulshine signed and filed as Treaty's Assistant Secretary ("Belize

Announcement"). In it, Reid is quoted as stating that the supposed oil-striking well Treaty had drilled in Belize – named the San Juan Well # 2 – contained an estimated "5,000,000 to 6,000,000 [b]arrels of recoverable oil." The Belize Announcement also stated that Treaty's claimed oil strike was "similar to some of the great oil producing zones in Texas . . . [that] have produced hundreds of millions of barrels of oil."

45.  In response to the Belize Announcement, Treaty's stock price and volume increased dramatically by 79.3% and 1,992%, respectively, in a single day.

46.  Unfortunately for investors and the markets, Treaty's Belize Announcement was completely false – the company did not find oil.

47.  On January 31, 2012 – the day Treaty publicly filed the Belize Announcement as an attachment to its Form 8-K – the GOB published its own press release in Belize refuting the company's Belize Announcement and describing the statements in it as "false and misleading" and "irresponsible." The GOB went on to state that it observed "no live oil" at the San Juan Well #2. The same day, the GOB informed Reid of its findings and demanded that Treaty make no further false statements. Treaty's stock price and trading volume declined in response to the GOB's press release disavowing the patently false Belize Announcement.

48.  Despite the GOB's admonitions, and knowing Treaty had not struck oil in Belize, Blackburn and the Treaty Officers willfully, or at the very least recklessly, continued to mislead investors and prospective investors by assuring them that the claimed oil strike was real. Specifically, they told investors that while the GOB privately agreed that Treaty struck oil at the San Juan Well #2, it had issued the press release denying the strike as punishment for not obtaining GOB approval before publishing the Belize Announcement.

49.    Treaty published a second press release about the Belize Program on February 1,

2012 ("Second Belize Announcement"). Astonishingly, the Second Belize Announcement,

signed by Mulshine acting once again at Blackburn's direction, confirmed Treaty's claim of a

"first successful oil well strike." This announcement had the intended effect of halting declines

in Treaty's stock price and trading volume following the GOB's press release disclaiming the

original Belize Announcement. Consequently, Treaty's stock price and volume did not return to

pre-Belize Announcement levels until late April 2012. *See* Table 1, *infra.*

*Table 1*



50.    Blackburn, Reid, and Mulshine knew, or were severely reckless in failing to

know, that the statements contained in Treaty's Belize Announcement, Second Belize

Announcement, and other press releases and investor solicitations were false.

51.    Treaty ultimately failed to produce any oil in Belize and, in July 2014, the GOB

ordered the company to plug and abandon the San Juan Well #2 along with two other dry-hole

wells Treaty had also drilled at or around the same time. Neither Treaty nor the Treaty

Defendants have ever disclosed these facts to the public or to Treaty's shareholders.

52.     On November 11, 2014 Treaty published a shareholder letter on the company's Facebook page ("Shareholder Letter").  Treaty's Shareholder Letter admits at least some of the company's wrongdoing in connection with the Belize Program.  In it, the company states that "it is time for the shareholders to know *the truth* about [Treaty's] endeavors" in Belize (emphasis added).  Treaty goes on to admit that it "abandoned Belize" in January 2014 after assigning away all assets to another company – "without reporting to shareholders."  Treaty further states that the company "is changing and regardless of the criticisms leveled at the company in the past, *often as we will point out, for valid reasons…*" and that "[w]e are striving to give you your company back" (emphasis added).

53.     Treaty's Shareholder Letter notwithstanding, the company has at all times misrepresented or failed to disclose complete and true facts concerning the Belize Program, as well as Blackburn's control over the Belize Program and Treaty as a whole.

**E.    DEFENDANTS CONDUCT A FRAUDULENT TRADING SCHEME USING TREATY STOCK.**

54.     Based on the foundation of their myriad disclosure violations between 2009 and 2013, Blackburn, Reid, Gwyn, Schlesinger, and Mulshine engaged in the illegal offer and sale of Treaty securities during that period through: (a) an unregistered public offering of restricted stock; and (b) Form S-8 offerings of registered, unrestricted stock to ineligible recipients. During that time, Treaty, Blackburn, Reid, Gwyn, Schlesinger, and Mulshine transferred more than 110 million Treaty shares from which they raised approximately $3.6 million from approximately 90 investors located in several different states.

55.     One of the goals of the Treaty Defendants' campaign to conceal Blackburn's role and tout the fictional oil strike in the Belize Program was to lure prospective investors to the company in order to sell them restricted common stock at a discount to market price.  In most of

those instances, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger would then refer shareholders to Whitley, the company's outside securities counsel, to obtain an "opinion letter" – a necessary prerequisite before removing the restrictive legend from a stock certificate and which is issued under Securities Act Rule 144 governing the public resale of restricted securities when certain conditions are satisfied. During the relevant period and based on Blackburn and the Treaty Officers' referrals, Whitley prepared more than 100 opinion letters for more than 70 investors that led to the removal of a restrictive legend on over 300 million Treaty shares without a registration statement being filed or in effect.

56.     Whitley typically prepared these opinion letters without ever speaking with Treaty's management or the shareholder. He rarely, if ever, asked shareholders to provide details about the origin of their investments in Treaty. Rather, in most cases, he merely required a stock certificate indicating a six-month holding period and a statement from the shareholder that he or she was not a Treaty affiliate.

57.     Notably, Whitley never questioned anyone at Treaty as to why the company continued to issue high volumes of unregistered shares to investors or whether the company's offerings were exempt from registration.

58.     However, when certain investors refused to buy restricted shares and instead demanded free trading Treaty shares, the Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger used Form S-8 to further their fraudulent trading scheme. Specifically, they illegally transferred at least 10.4 million Treaty shares purportedly registered under Form S-8 in exchange for cash payments or to pay commissions for stock sales.

59.     Form S-8, also known as a "registration statement," is a document publicly traded companies such as Treaty file with the Commission to register securities that will be offered to

company employees and consultants. Rules governing the filing of Treaty's Forms S-8 mandate that only consultants who provided *bona fide* services to the company could receive the company's Form S-8 stock. Significantly, Treaty was not permitted to issue stock purportedly registered under Form S-8 in exchange for cash payments or to pay commissions for stock sales.

60.     Treaty filed Form S-8 registration statements on February 23, 2011 (registering 100 million shares), August 24, 2012 (registering 55 million shares), and February 20, 2013 (registering 30 million shares), to register a total of 185 million shares of common stock. Reid signed all of Treaty's Forms S-8 during the relevant period. Gwyn and Schlesinger also signed Treaty's Forms S-8 filed in 2012 and 2013.

61.     Treaty and the Treaty Defendants devised two methods to circumvent the restrictions governing registration and sale of shares under Form S-8.

62.     In the first scenario, Blackburn directed Mulshine to draft, and Reid to sign, fake consulting agreements and board minutes claiming that investors were actually consultants who performed services for Treaty in exchange for stock, and approving the issuance of Form S-8 shares to such investors. Mulshine drafted, and Reid approved, false board minutes that Mulshine transmitted to Treaty's transfer agent, knowing that the transfer agent would not transfer unrestricted Treaty shares to recipients who had not provided *bona fide* services to the company. As one example of this method, Blackburn sold 5,000,000 free trading shares to an investor in or around October 2, 2012, which Treaty authorized as a stock award owed for services rendered to the company by the investor pursuant to a fake consulting agreement. Over the course of the next six months, beginning October 16, 2012, the investor sold 4.4 million shares through his brokerage account for a net profit of $24,000.

63.     In the second scenario, Treaty issued Form S-8 stock first to Blackburn or Reid

pursuant to their existing consulting agreements and they, in turn, then transferred the

purportedly free trading shares to investors in exchange for cash.  In one instance, Treaty issued

3,400,000 free trading shares to Blackburn on March 15, 2013, purportedly for an obligation

owed to him under a consulting agreement.  On March 19, 2013, Blackburn illegally resold those

shares to an investor for $17,000.  Subsequently, the investor reaped a net profit of over $12,000

as a result of trades made between April 17, 2013 and April 26, 2013.

64.     Blackburn, Reid, Gwyn, Mulshine, and Schlesinger also issued unrestricted Form

S-8 shares to themselves, which they illegally sold into the market.  For instance, Treaty illegally

issued 2,000,000 purportedly free trading shares to Schlesinger on August 8, 2011 as

commission for Treaty stock sales. Schlesinger transferred those purportedly unrestricted shares

to two companies controlled by Gwyn.  Then, after only holding those shares for three months

instead of the required six, Gwyn sold the unregistered securities for a profit of $53,213.87.

**F.    WHITLEY IGNORES BLACKBURN'S ROLE AS A DE FACTO TREATY OFFICER AND PERPETUATES THE TREATY DEFENDANTS' TRADING SCHEME THROUGH LEGAL OPINIONS SUPPORTING TREATY'S FORMS S-8.**

65.     Whitley served as Treaty's corporate and securities counsel from July 2009

through July 2013.  During that time, he knew or was reckless in not knowing that Blackburn

functioned as a *de facto* Treaty officer.

66.     Whitley was aware that Blackburn had significant involvement in, and control

over, Treaty's day-to-day operations.  In addition to the fact that Blackburn was involved in

hiring Whitley as company counsel and the two thereafter routinely engaged in discussions about

the company's business operations, Whitley knew that:

    (a)     Blackburn worked in the same office suite occupied by Treaty's corporate headquarters;

(b)     Blackburn was Treaty's only purported consultant to share office space with the company;

(c)     Blackburn beneficially owned more than 10% of Treaty's stock between July 2009 and November 2011 but failed to file Forms 3, 4, and 5 with the Commission;

(d)     Blackburn sold Treaty stock, issued to him by the company, to finance company operations;

(e)     Blackburn was responsible for identifying oil and gas acquisitions for Treaty;

(f)     Blackburn, along with CEO Reid, formed and operated a company to raise funds for Treaty; and

(g)     Blackburn solicited investors on Treaty's behalf.

67.     Yet, despite his awareness of Blackburn's extensive involvement with Treaty, Whitley never questioned whether Blackburn's role was inconsistent with his title of "consultant."

68.     In addition, Whitley authored and supplied Treaty's transfer agent a Rule 144 opinion letter on February 14, 2013 that improperly resulted in Blackburn's personal receipt of 12,160,026 purportedly unrestricted, free-trading Treaty shares. In the opinion letter, which was required before the transfer agent would issue the unrestricted shares, Whitley falsely stated that the shares, originally issued to Blackburn on August 8, 2012 as compensation for shares he previously sold to raise capital for the company, could be issued and sold by Blackburn without restriction pursuant to Rule 144(b)(1) of the Securities Act. In so opining, Whitley falsely affirmed that Blackburn was not an affiliate of Treaty and expressly represented that Blackburn did not control the company – facts he knew, or was reckless in not knowing, were false based on his dealings with Treaty and its officers and directors and his familiarity with the company and its operations as its outside counsel.

69.     Relying on Whitley's opinion letter claiming that Blackburn was not a Treaty affiliate – defined by Rule 144(a)(1) as any person that directly or indirectly controls or is controlled by, or is under common control with, an issuer – Treaty's transfer agent removed the restrictive legend from Blackburn's stock certificate covering 12,160,026 Treaty shares.

70.     Blackburn wasted no time selling the improperly unrestricted shares, and on February 22, 2013 sold 4,000,000 shares to an investor for $20,000.  The investor, in turn, sold those shares into the market on March 3, 2013 for net proceeds of $21,630.60.  Had Whitley informed Treaty's transfer agent that Blackburn was indeed a Treaty affiliate, Blackburn would not have been able to sell purportedly free-trading shares to the investor.

71.     Whitley also improperly issued legal opinions in connection with Treaty's 2012 and 2013 Form S-8 filings.

72.     Under Regulation S-K Item 601(b)(5)(i) [17 CFR 229.601], Treaty's registration statements on Forms S-8 could not become effective without a legal opinion concluding that the registered shares would be legally issued, fully paid, and non-assessable.

73.     Whitley was aware, or at the very least had information indicating, that Treaty violated Form S-8 rules on at least three separate occasions in connection with its 2011 Form S-8 filing, including:

(a)     October 10, 2011, Whitley prepared an opinion letter to UBS Financial Services, Inc., affirming issuance of 487,805 shares to a Treaty shareholder in exchange for "certain business consulting services" provided to the company.  In providing the opinion letter, Whitley relied on a stock award agreement indicating that the shares were not awarded for consulting services, but rather to satisfy an outstanding debt Treaty owed the shareholder;

(b)     On July 31, 2012, Whitley reviewed Treaty's July 25, 2012 board minutes indicating that the company issued Blackburn Form S-8 shares on April 27, 2011. As documented in the board minutes, Blackburn then sold the shares to provide funds for the company on or about June 15, 2011; and

(c)     In September 2012, Whitley reviewed August 27, 2012 board minutes stating that Treaty issued 1,262,500 Form S-8 shares to Mulshine as a commission for selling Treaty stock to an investor.

74.     Yet despite possessing information demonstrating that Treaty and the Treaty Defendants improperly issued Form S-8 shares in exchange for cash and to pay commissions instead of for *bona fide* services, Whitley provided necessary legal opinions claiming that securities registered by Treaty's 2012 and 2013 Forms S-8 would be legally issued, fully paid and non-accessible. Of course, as alleged *infra*, Treaty's Forms S-8 were improper and ineffective to register the securities, and the offer and sale of securities thereunder was illegal.

## G.    TREATY LAUNCHES AN UNREGISTERED AND FRAUDULENT OIL AND GAS OFFERING PROGRAM.

75.     By June 30, 2013, Treaty depleted all of its authorized shares.

76.     At or around that time, Treaty opened a new bank account and began offering investors purported oil and gas working interests in a well located in West Texas.

77.     Treaty, Blackburn, and the Treaty Officers falsely represented to prospective investors that the well had an initial production rate of 62 barrels of oil per day and a lifespan of 20 years. They further claimed that the working interests were a low risk investment expected to yield a return of 111.42% over a ten year period. In reality, records maintained by the State of Texas reveal that the well only produced 235 total barrels of oil between October 2013 and October 2014, well less than the touted 62 barrels per day. Blackburn, Reid, Gwyn, Mulshine, and Schlesinger knew, or were reckless in not knowing these facts. Nevertheless, between October 29, 2013 and February 27, 2014, they raised approximately $565,000 from 19 investors.

78.     But unbeknownst to their investors, the Defendants did not use investment funds to fund future and current oil and gas field developments as they represented they would.

79.     Offering documents for Treaty's oil and gas offering program represented that funds received from investors would be used to reimburse Treaty for drilling and completion expenses, to fund current and future oil and gas operations or even to "pay expenses and further fund Company operations on a day-to-day basis."

80.     Contrary to these representations Treaty misappropriated investor funds to pay legal fees incurred during the Commission's investigation underlying this action.  In addition, more than $230,000 of investor funds was improperly transferred to Blackburn, Reid, and Gwyn without their investors' knowledge or permission.

## H.     BLACKBURN, REID, GWYN, AND SCHLESINGER FAIL TO INFORM THE COMMISSION AND PUBLIC THAT THEY OWN, AND THE EXTENT TO WHICH THEY OWN, STOCK IN TREATY.

81.     Exchange Act Section 16(a) and Rule 16a-3 thereunder require certain directors and officers, and persons who beneficially own more than 10% of a registered class of a company's equity securities, to file reports of ownership and changes of ownership with the Commission.

82.     As a matter of law, any person who becomes subject to this requirement must file an initial report on Form 3 within ten days of acquiring that status.  Once Form 3 is filed, that person must report any changes in his holdings on Form 4 within two business days following the change in beneficial ownership.  An annual report on Form 5 must be filed annually within 45 days of the issuer's fiscal year end to report any transactions or holdings that should have been reported on Form 4 during the prior fiscal year but were not, or to report exempt transactions.

83.     At various points in time, Blackburn, Reid, Gwyn, and Schlesinger each failed to make required filings with the Commission on Forms 3, 4, and 5 regarding their ownership of Treaty stock.

84. Blackburn, Gwyn, and Schlesinger never made any of these required filings.

85. While Reid filed Form 3 in 2011 and reported additional acquisitions on Forms 4 in 2011, he failed to file requisite forms disclosing additional acquisitions of Treaty stock acquired after 2011, or his beneficial ownership of Treaty stock through affiliated entities. Reid completely failed to file Forms 4 when he disposed of shares.

## I. DEFENDANTS PROFITED FROM THEIR WRONGDOING.

86. Of the $4.9 million Treaty and the Treaty Defendants raised, $3.5 million was misappropriated by Blackburn, Reid, Gwyn, Mulshine, and Schlesinger via direct payments from Treaty and through sales of Treaty stock, as summarized in Table 2, below. Blackburn, Reid, Gwyn, Mulshine, and Schlesinger each received Treaty stock awards and/or received shares at a deep discount. For instance, Schlesinger purchased 20,000,000 shares from Treaty at a 50% discount with money he borrowed from his mother. Later, Schlesinger sold the shares for a net profit of $188,668.

*Table 2*

| Payments and Proceeds to Blackburn and the Treaty Officers | | | | |
|---|---|---|---|---|
| **Name** | **Time Period** | **Net Payments from Treaty and Affiliates** | **Net Proceeds from Stock Sales** | **Totals** |
| Blackburn | 2/2009 – 2/2014 | $ 852,210 | $ 709,000 | $1,561,210 |
| Reid | 6/2010 – 2/2014 | $ 418,452 | $ 106,579 | $ 525,031 |
| Mulshine | 6/2010 – 6/2012 | $ 69,253 | $ 39,039 | $ 108,291 |
| Gwyn | 7/2010 – 2/2014 | $ 475,963 | $ 294,972 | $ 770,935 |
| Schlesinger | 7/2011 – 2/2014 | $ 322,498 | $ 188,668 | $ 511,166 |
| Totals | | **$2,138,376** | **$1,269,257** | **$3,476,632** |

87. For his part, Whitley received 400,000 shares of Treaty stock and more than $30,000 in fees, in addition to aiding the efforts of Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger to profit from their schemes.

## V.
## COMMISSION'S CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and 5(c) by All Defendants

88.     The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint

as if fully set forth herein.

89.     By their conduct as alleged above, Defendants, directly or indirectly, singly or in

concert with others, (i) made use of means or instruments of transportation or communication in

interstate commerce or of the mails to sell, through the use or medium of a prospectus or

otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of

sale or delivery after sale, carried or caused to be carried through the mails or in interstate

commerce, by any means or instruments of transportation, securities as to which no registration

statement was in effect; or (iii) made use of any means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell or offer to buy, through the

use or medium of a prospectus or otherwise, securities as to which no registration statement had

been filed.

90.     By engaging in this conduct, Defendants violated and, unless enjoined, will

continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and §77e(c)].

### SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 5(a) and 5(c) by Whitley

91.     The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint

as if fully set forth herein.

92.     Whitley, knowingly or recklessly, provided substantial assistance to all other

Defendants, and each of them, in their violations of Sections 5(a) and 5(c) of the Securities Act

[15 U.S.C. § 77e(a) and §77e(c)].

*SEC v. Blackburn, et al.*                                                      Page 26
First Amended Complaint

93.     By reason of the foregoing, Whitley aided and abetted Defendants' violations and, unless enjoined, will continue to aid and abet violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and §77e(c)].

## THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a) by
### <ins>Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger</ins>

94.     The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

95.     By engaging in the conduct alleged above, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or of the mails:

(a)     employed devices, schemes or artifices to defraud;

(b)     obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

96.     With regard to their violations of Section 17(a)(1) of the Securities Act, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger acted intentionally, knowingly or with severe recklessness with respect to the truth.  With regard to their violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger acted at least negligently.

97.     By engaging in this conduct, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §§ 77q].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act 10(b) and Rule 10b-5 thereunder by
### Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger

98.    The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

99.    By engaging in the conduct alleged above, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

100.    Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger engaged in this conduct intentionally, knowingly or with severe recklessness with respect to the truth.

101.    By engaging in this conduct, Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(a) and Exchange Act Rules
### 12b-20, 13a-1, 13a-11 and 13a-13 by Treaty

102.    The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

103.    Treaty misrepresented, failed to disclose, and omitted material information

concerning the company, and those operating it, in public filings made with the Commission

between November 2009 and January 2014.

104.    By engaging in this conduct, whose securities are registered pursuant to Section

12 of the Exchange Act [15 U.S.C. § 78], failed to file annual and quarterly reports on Forms 10-

K and 10-Q that were true and correct, and failed to include material information in its required

statements and reports as was necessary to make the statements made, in light of the

circumstances under which they were made, not misleading.

105.    By reason of the foregoing, Treaty violated, and unless enjoined, will

continue to violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1,

13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 13(a)**
**and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13**
**by Blackburn, Reid, Gwyn, and Schlesinger**

106.    The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint

as if fully set forth herein.

107.    Blackburn, Reid, Gwyn, and Schlesinger, knowingly or recklessly, provided

substantial assistance to Treaty in its violations of Section 13(a) of the Exchange Act and

Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

240.13a-11, and 240.13a-13].

108.    By reason of the foregoing, Blackburn, Reid, Gwyn, and Schlesinger aided and

abetted Treaty's violations and, unless enjoined, will continue to aid and abet violations of

Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and

13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

### SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 13(a)
### and Exchange Act Rules 12b-20 and 13a-11 by Mulshine

109.    The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

110.    Mulshine, knowingly or recklessly, provided substantial assistance to Treaty in its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11].

111.    By reason of the foregoing, Mulshine aided and abetted Treaty's violations and, unless enjoined, will continue to aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-11].

### EIGHTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13a-14 by Reid and Gwyn

112.    The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

113.    By engaging in the conduct alleged above, Reid and Gwyn violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] when they certified Treaty's quarterly and annual reports on Forms 10-K and 10-Q, filed with the Commission between 2010 and 2013, stating that those reports did not contain any untrue statements of material fact, or omit to state any material facts and that they fairly represented in all material respects Treaty's financial condition, results of operations and cash flows as of, and for the periods covered in each report.

114.    By reason of the foregoing, Reid and Gwyn violated and, unless enjoined, will continue to violate Exchange Act Rule 13a-14. [17 C.F.R. § 240.13a-14]

## NINTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 16(a) and Exchange Act Rule 16a-3 by
### Blackburn, Reid, Gwyn, and Schlesinger

115.   The Commission repeats and re-alleges Paragraphs 1 through 87 of the Complaint as if fully set forth herein.

116.   By engaging in the conduct alleged above, Blackburn, Reid, Gwyn, and Schlesinger violated Exchange Act Section 16(a) and Rule 16a-3 thereunder [15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3] when they failed to make required filings with the Commission on Forms 3, 4, and 5 and, unless enjoined, will continue to violate Exchange Act Section 16(a) and Rule 16a-3 thereunder.

## VI.
## RELIEF REQUESTED

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a)   Permanently enjoining all Defendants and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Sections 5(a) and 5(c) of the Securities Act [5 U.S.C. §§ 77e(a), §77e(c)].

(b)   Permanently enjoining Whitley and his agents, servants, employees, attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from aiding and abetting any violation of Sections 5(a) and 5(c) of the Securities Act [5 U.S.C. §§ 77e(a), §77e(c)].

(c)   Permanently enjoining Treaty, Blackburn, Reid, Gwyn, Mulshine, and Schlesinger and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(d)     Permanently enjoining Treaty and its agents, servants, employees, attorneys and all persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder;

(e)     Permanently enjoining Blackburn, Reid, Gwyn, and Schlesinger and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from aiding and abetting any violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder;

(f)     Permanently enjoining Mulshine and his agents, servants, employees, attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from aiding and abetting any violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11;

(g)     Permanently enjoining Reid and Gwyn and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Exchange Act Rule 13a-14;

(h)     Permanently enjoining Blackburn, Reid, Gwyn, and Schlesinger and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Section16 (a) of the Exchange Act and Rule 16a-3 thereunder;

(i)      Permanently enjoining Whitley from directly or indirectly (1) providing legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption from the registration provisions of the Securities Act; and (2) providing legal services to any person or entity in connection with filing Form S-8 with the Commission;

(j)      Ordering all Defendants to disgorge the ill-gotten gains realized by each of them, jointly and severally as warranted, plus prejudgment interest;

(k)      Ordering each Defendant to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(l)      Prohibiting Blackburn, Reid, Gwyn, Mulshine, and Schlesinger, under Section 20(e) of the Securities Act [15 U.S.C. §77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)];

(m)      Prohibiting all Defendants, under Section 20(g)(1) of the Securities Act [15 U.S.C. §77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. §78u(d)(6)(A)], from engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock.

(n)      Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(o)      Granting all other relief to which the Commission may be entitled at law or in equity.

Dated:  October 1, 2015                  Respectfully submitted,

Jennifer D. Brandt
Trial Attorney
Texas Bar No. 00796242
Chris Davis
Texas Bar No. 24050483
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas  76102-6882
Direct phone: (817) 978-6442 (jdb)
Fax: (817) 978-4927
*brandtj@sec.gov*
COUNSEL FOR PLAINTIFF