| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CIVIL ACTION |
| VERSUS | No.: 15-2451 |
| RONALD L. BLACKBURN, ET AL. | SECTION: "J" (1) |

## ORDER & REASONS

Before the Court are cross-motions for summary judgment filed by the parties. The Securities and Exchange Commission ("SEC") has filed a *Motion for Summary Judgment* **(Rec. Doc. 182)** against Defendants Ronald L. Blackburn, Andrew V. Reid, Bruce A. Gwyn, and Michael A. Mulshine (collectively, the "Officer Defendants"). The Officer Defendants oppose the SEC's motion (Rec. Doc. 194) and filed their own *Motion for Summary Judgment* **(Rec. Doc. 197)**; the SEC filed a corresponding opposition (Rec. Doc. 200) and a *Motion to Strike* **(Rec. Doc. 204)**. Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the SEC's Motion to Strike should be **GRANTED**, the SEC's Motion for Summary Judgment should be **GRANTED in part**, and the Officer Defendants' Motion should be **DENIED** for the reasons set forth herein.

## FACTS AND PROCEDURAL BACKGROUND

### I.   THE FORMATION OF TREATY ENERGY CORP.

All of the Defendants are alleged to have violated securities laws through their involvement with Treaty Energy Corp. ("Treaty"), an oil and gas production company

incorporated in Nevada and located in New Orleans, Louisiana.[1] During the relevant period, January 2009 to September 2013, Treaty was subject to the periodic and current reporting requirements of Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act").[2] Treaty was a "penny stock" company traded over-the-counter on OTC Pink, an inter-dealer electronic quotation and trading system for registered and unregistered securities. OTC Pink does not have listing requirements for the stocks quoted on its system.[3] No registration statements for Treaty were ever filed with the SEC, except for a purported Form S-8 registration for an employee benefit plan. During the relevant four-year period, Treaty's stock traded daily at a volume of 1.4 million shares at an average price of $0.03 per share.[4] Treaty did not file a Form 10-K for the year ending 2013 and the SEC ordered a stop on trade of Treaty's shares on December 22, 2014.[5]

Treaty was started by Ronald Blackburn in 2008, and Blackburn remained the driving force behind the company for the relevant period, although nominally he was never more than a mere consultant and shareholder.[6] Blackburn explained that he

---

[1] (Plaintiff's Statement of Material Facts which Present No Genuine Issue, Rec. Doc. 182-2, at 1) (hereinafter Pl's SOF).

[2] *Id.* at 2.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] Blackburn's tremendous influence over Treaty is undeniable. Blackburn kept what he purported to be his personal office in the same building and on the same floor as Treaty. His office was immediately next to Reid's. (Ronald Blackburn Transcript, Rec. Doc. 182-10, at 114) (hereinafter Blackburn Tr.). Although Blackburn has disclaimed he controlled day-to-day business at Treaty, he admitted that it was his selling of his shares on behalf of Treaty that paid the company's bills. And because Blackburn directly controlled Treaty's funding, he controlled the company's enterprise. Critically, the decision to enter into an exploratory drilling program in Belize, the venture that is at the heart of the SEC's fraud allegations, was Blackburn's. Additionally, Blackburn helped draft the false announcement that Treaty had struck oil in Belize.

was never an officer or director at Treaty "[b]ecause No. 1, [he] was a felon, and [he] had been told you couldn't hold that position [as a felon]."[7] Blackburn had been convicted of felony counts of federal income tax evasion, filing a false tax return, and two counts of payroll tax violations in 1999.[8] Blackburn founded Treaty after the previous company he had been consulting for, Phoenix Associates Land Syndicate ("Phoenix"), bankrupted.[9]

While he had been consulting at Phoenix, Blackburn met Michael Mulshine, who would become Treaty's Assistant Secretary (and sometimes Acting Corporate Secretary). Blackburn called Mulshine and asked for his help in forming a new publicly traded oil and gas company. In December 2008, Mulshine helped Blackburn find the corporate entity that was used to form Treaty through a reverse merger. At inception, Blackburn received an 86.4% interest in the public company (397,440,000 shares of Treaty common stock), Mulshine received a 3.6% interest in the company (16,560,000 shares), and the remaining 10% interest (46,000,000 shares) was distributed to the stockholders of the former company which was part of the reverse merger.[10] Blackburn did not pay any money for his stake in the company.[11]

---

[7] *Id.* at 100.

[8] (Pl's SOF, Rec. Doc. 182-2, at 3).

[9] *Id.* at 4. Blackburn found his "in" with Phoenix when he met a CPA for Phoenix in prison. *Id.*; (*see also* Blackburn Tr., Rec. Doc. 182-10, at 100). When Blackburn was recruited to the company, Phoenix's attorney told Blackburn that his felony convictions prevented him from being an officer, so Blackburn became a consultant instead. (Pl's SOF, Rec. Doc. 182-2, at 2). With no prior experience in the oil and gas field, Blackburn found some mineral leases and Phoenix purchased them. *Id.* When Phoenix subsequently bankrupted, the trustee sued Blackburn for misappropriating $1.9 million from the company. Blackburn settled the claim for $1.3 million. *Id.*

[10] *Id.* at 4.

[11] *Id.* at 5.

In 2009, Blackburn recruited Andrew Reid to be Treaty's president and to help secure a deal for drilling rights in Belize.[12] Later, Reid would become CEO, and he served as Chairman of the Board from April 2010 to July 2014.[13] Reid in turn hired Bruce Gwyn to raise capital for Treaty. Gwyn served as Treaty's co-CEO until January 2013, when Gwyn became Chief Operating Officer ("COO").[14] From April 2011 until he resigned on March 14, 2014, Gwyn also served as a director on Treaty's board.[15]

Reid is not an attorney—he was a former bond salesman who was working as a horse-drawn carriage driver in the French Quarter when Blackburn hired him as President.[16] So, with respect to his record keeping and filing obligations as CEO of a publicly traded corporation, Reid testified at his deposition that he depended on Treaty's "SEC attorney," Sam Whitley.[17] Reid did not hire Whitley; Whitley was "on board" with Treaty before Reid became President, although it is unclear if he was involved in the reverse merger that formed Treaty.[18]

The SEC's allegations revolve around two of Treaty's oil and gas ventures and the stock distributions used to fund these undertakings. One was an exploratory drilling program that began in April 2010 in Belize, and the other was an offering for working interests in oil wells in west Texas beginning in February 2013.

---

[12] (Andrew Reid Transcript, Rec. Doc. 182-11, at 55) (hereinafter Reid Tr.).
[13] (Pl's SOF, Rec. Doc. 182-2, at 7).
[14] *Id.* at 8.
[15] *Id.*
[16] (Reid Tr., Rec. Doc. 182-11, at 53).
[17] *Id.* at 57.
[18] *Id.*

## II.    THE STOCK DISTRIBUTIONS

At inception, Treaty's only assets were some mineral leases in Texas with "sporadic production."[19] Treaty needed funds to repair these wells, invest in new leases, and pay salaries, but Reid testified that Treaty had little institutional investment from the start.[20] To pay its expenses, Treaty needed to sell stock. "In the early days of Treaty, it was mostly – Treaty had no stock, and so all of the shares were Ron Blackburn's."[21] Because Blackburn owned 86.4% of Treaty's shares, and Treaty itself "had no availability of stock in the treasury or anything to sell," Blackburn "would loan [his shares] to Treaty in order to facilitate a sale."[22] "Investors would pay for the securities through Treaty and then – the majority of the time, and then . . . Blackburn would have those shares issued."[23] Reid testified that either he or Blackburn would communicate with the investors to facilitate the sale.[24]

Blackburn agreed that it was his expectation from the beginning that he would use his shares to pay back investors and grow Treaty.[25] Blackburn testified it was "questionable" that Treaty ever had sufficient revenues to cover its expenses.[26] Treaty was only able to pay its debts by raising money from investors.[27] After Blackburn had issued a significant number of his shares to investors, Treaty issued Blackburn

---

[19] (Blackburn Tr., Rec. Doc. 182-10, at 107).
[20] (Reid Tr., Rec. Doc. 182-11, at 59-60).
[21] *Id.* at 60.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] (Blackburn Tr., Rec. Doc. 182-10, at 107).
[26] *Id.* at 108.
[27] *Id.*

millions of additional shares to replace the shares Blackburn had "loaned" to Treaty.[28] Blackburn sold those shares as well.[29] The SEC estimates Blackburn ultimately distributed at least 380 million of the shares issued to him to more than 200 individuals and entities spread across several states.[30]

The SEC has submitted the sworn declarations of several of the investors who purchased Blackburn's shares of Treaty. One of these investors, Chris Ezzell, was recruited by Reid to invest his savings in Treaty. Ezzell attests that Reid told him that Koch Industries had already invested $300 million in Treaty and that Ezzell had the opportunity to get in on the ground floor. Ezzell agreed to invest most of a settlement he received for a catastrophic brain injury, $225,000. Ezzell considered selling his stock in Treaty several times, but each time he says he was convinced not to by Reid.[31] When Ezzell finally learned from a friend that Treaty was being investigated by the SEC, Ezzell claims Reid told him not to sell because Treaty "was suing the SEC for $33 million for prohibiting [Treaty] from doing business, and that when they got the $33 million from the SEC, [Reid] would give me my money."[32]

While the common stock initially issued to Blackburn was never registered, Treaty later filed three Form S-8 registration statements with the SEC.[33] The first was filed on February 23, 2011, registering 100 million shares of common stock. The second was filed on August 24, 2012, registering 55 million shares of common stock.

---

[28] (Pl's SOF, Rec. Doc. 182-2, at 39).
[29] *Id.*
[30] *Id.* at 39.
[31] (Declaration of Chris Ezzell, Rec. Doc. 182-5, at 7) (hereinafter Ezzell Decl.)
[32] *Id.* at 9.
[33] (Pl's SOF, Rec. Doc. 182-2, at 41).

The third was filed on February 21, 2013, registering 30 million shares. Reid signed all three statements, and Gwyn signed the second and third.[34]

"[A]n S–8 registration form can be used by a company only to issue stock as a means of compensating consultants for bona fide services not connected with raising capital." *S.E.C. v. Phan*, 500 F.3d 895, 903 (9th Cir. 2007). Reid testified he was completely uneducated as to the limitations of an S-8 offering; he depended on Whitley.[35]

The SEC's ledgers show that between February 2, 2011, and March 15, 2013, Treaty issued more than 180 million shares to more than thirty individuals residing in multiple states.[36] The SEC has provided evidence that at least a significant number of the S-8 shares were distributed to "consultants" who were being compensated for their capital raising roles with a discounted sales price for Treaty securities. Asked about one such "consultant," John Bushnell, Reid admitted Bushnell had no other duties than to "bring in capital for the company."[37] Blackburn provided illuminating testimony as to Treaty's arrangement with Bushnell:

> Q.   So Mr. Bushnell writes [in his e-mail], 'Good afternoon, Ron. I do have cash and I am looking for volume. My offer is as follow [sic]: 5 million shares of your S-8 free trading shares TECO, $90,000, $45,000 wired tomorrow mid-day, the remaining $45,000 to be wired upon receipt of the 2 million shares I paid for last week.'
>
> A.   Yeah.
>
> Q.   You mentioned that Mr. Bushnell was one of Treaty's larger investors?

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] (Reid Tr., Rec. Doc. 182-2, at 65).

A. I think now he is the largest investor.

Q. And Mr. Bushnell was offering to pay $90,000 for [five] million of S-8 free trading Treaty shares?

A. Yes, 5 million shares.

Q. You wrote back to Mr. Bushnell that "We will do the deal." Correct?

A. Uh-huh (affirmative response).

Q. Yes?

A. Yes.

\* \* \* \*

Q. So if you sold him the 5 million shares for $90,000, that would represent a significant discount to the market price?

A. Oh, yeah.

Q. Because the market price would have been, what, closer to $175,000?

A. Yeah.

Q. But he was going to get them for $90,000?

A. That is right.

Q. Did the deal go through?

A. I would think it did.

Q. So did Mr. Bushnell send the $90,000?

A. Yes, he was a man of his word.[38]

---

[38] (Blackburn Tr., Rec. Doc. 182-10, at 135).

Bushnell received the five million free-trading S-8 shares on October 11, 2012, and he immediately sold most of them into the market at a profit.[39] The SEC has provided evidence that millions more S-8 shares were distributed in similar fashion.[40]

The Officer Defendants participated in these distributions in a myriad of ways. Blackburn, Reid, and Gwyn each testified that they directly solicited investors to purchase either the unregistered shares or the S-8 shares. Moreover, as corporate officers at Treaty, Reid, Gwyn, and Mulshine also signed the transfer agent certifications and share agreements that were necessary to transfer Blackburn's shares and the S-8 shares to and between investors.[41]

### III. THE BELIZE VENTURE

On April 20, 2010, Treaty entered into a 50-50 joint venture with Princess Petroleum Limited ("Princess") to explore for oil and gas in Belize (the "Belize Venture").[42] Treaty stated in its 2010 Form 10-K that it paid $100,000 for its stake in the Belize Venture through a debt Treaty incurred to a "major shareholder."[43] Treaty did not disclose in the Form 10-K or elsewhere that the "major shareholder" was Ronald Blackburn or the extent of Blackburn's involvement in establishing the venture.

---

[39] (John Kevin Bushnell Statement of Account, Rec. Doc. 182-19, at 17).
[40] (Pl's SOF, Rec. Doc. 182-2, at 43).
[41] *Id.* at 45-47.
[42] (Treaty 2010 Form 10-K, Rec. Doc. 182-12, at 213).
[43] *Id.*

Blackburn testified as to how Treaty entered the deal. Blackburn was approached by a friend associated with Princess, Richard Lion, who asked Blackburn to go in with him on a venture using exploratory wells to search for oil in Belize:

> [Lion] said, you think that you could come up with the money to buy into this thing with Princess? And I asked him how much, and he said $100,000. He explained what he thought the potential was over there, there had only been one oil strike [in Belize] of substance, one company, and they were doing really well. . . . So anyways, I came up with the money, I sold a guy named Dan Bass 50 million shares of my stock for $100,000. He wired the money to me, and then I wired it to -- actually to Panama because that's where their main office in Central America was.[44]

Over the course of the next year, the Belize Venture became a crucial means by which Treaty's officers assured investors and potential investors of Treaty's future profitability. In a July 2011 press release prepared by Mulshine, Reid enthused:

> Ongoing developments and significant preparation in Belize are proving advantageous to a successful drilling program. Upon arrival of the drilling rig and support equipment by sea on or about July 24/25 our company will move ahead with an oil program that holds the potential to be a magnificent life changer for all Treaty stakeholders and the people of Belize.[45]

The Belize Venture was also used by a stock promoter, Platon Petratos, Treaty hired to drive investment in Treaty. Petratos contacted Mulshine in April 2011 and told Mulshine "he could bring a lot of buying in the stock" because Petratos "had promotional mechanisms that he used by setting up his own chat rooms on, like, Yahoo, chat boards, and such, where he would talk about [the stock], in his own [chat] sessions."[46] Mulshine recommended Treaty meet with Petratos, and Reid did so.[47]

---

[44] (Blackburn Tr., Rec. Doc. 182-10, at 118).
[45] (Treaty 7.18.11 Press Release, Rec. Doc. 182-21).
[46] (Michael Mulshine Transcript, Rec. Doc. 182-11, at 45) (hereinafter Mulshine Tr.).
[47] *Id.*

Mulshine testified that Reid and Petratos reached some sort of arrangement[48] and Petratos began posting about the Belize Venture on the message boards of sites such as investorshub.advfn.com and investorshangout.com in the fall of 2011.[49] Petratos made statements which indicated that the Belize Venture was about to strike oil, such as "I'll be there when she blows."[50] Between April 2011 and January 2012, Treaty's stock price increased 450% and the volume of trade increased 930%.[51]

On January 13, 2012, Reid e-mailed Petratos to say, "Platon, it would be nice if we could push through .04" cents per share.[52] Petratos replied, "I need some real support to go to Belize . . . plenty of expense, tickets alone 3,000, Make it happen."[53] Two weeks later, on January 26, 2012, Treaty posted pictures and a video of Treaty's drilling site in Belize.[54] Mulshine sent an e-mail to a distribution list with a link to Facebook and a message:

> Treaty posted a message to its Facebook page yesterday that on Tuesday they hit a Natural Gas zone between 400 and 500 feet on the 1st Well that is being drilled!!!! This is very good!!!! Remember gas drives oil and we do have a strong use for gas at this time in Belize!!! Drilling "to depth" started on Tuesday morning and is expected to be completed to about 2,000 ft this week. Keep tuned in for further developments. Please feel free to call or email me regarding any of this. We are all clearly very excited with the great progress being made in Belize and Texas![55]

In the weeks leading up to Mulshine's message and the Facebook post, some investors had grown concerned. One investor asked Mulshine in a January 5, 2012 e-mail

---

[48] *Id.* at 46.
[49] (Pl's SOF, Rec. Doc. 182-2, at 13).
[50] *Id.*
[51] *Id.* at 14.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.* at 14-15.

whether "the first well in Belize [was] dry."[56] Mulshine responded he could not report on the drilling, but nevertheless, he stated, "I assure you that Treaty will be successful in its efforts to produce oil from Belize. Lots happening in Belize that cannot be made public yet."[57] About the same time Mulshine sent his e-mail touting Treaty's progress in Belize, Petratos was leading a group of investors to the nation. Reid arranged for the "four VIPS" to stay at "the Princess," a hotel associated with Treaty's co-venturer.[58]

Meanwhile, Treaty had hired Max Mohamed—a geologist who did business under the moniker Advanced Geological Services—as its mudlogger on the ground.[59] When Mohamed was brought in, he was told testing indicated a possibility of hydrocarbons at one of Treaty and Princess's Belize wells—called the San Juan #2 well—at 800 feet and 1200 feet below the surface.[60] Mohamed found no indications of oil at 800 feet, but at 1200 feet the drilling team hit limestone and the sample they pulled "smelled strong of oil."[61] The next step after getting this smell of oil was to take samples, dry them, add a solvent to release any oil, and see what floated up, using a blacklight to look for fluorescence.[62] Upon performing this test, "[o]il stains appeared from the black light."[63] A "bluish yellow" hue made it "look like a trace of oil was in

---

[56] *Id.* at 14.

[57] *Id.*

[58] *Id.* at 15.

[59] "A mudlogger collects, documents, and interprets geological samples and gas readings from oil wells, information which a well operator will use to make drilling decisions." *Reyes v. Quality Logging, Inc.*, No. 5:14-CV-21, 2017 WL 10646615, at *1 (S.D. Tex. Mar. 31, 2017).

[60] (Max Mohamed Transcript, Rec. Doc. 182-11, at 12) (hereinafter Mohamed Tr.).

[61] *Id.*

[62] *Id.*

[63] *Id.* at 15.

the sample."[64] These results amounted to what Mohamed called an "oil show." Mohamed explained the significance of this:

> [An oil] show doesn't mean that you see visible oil. It means you see some indication of some sort of hydrocarbon present. It's a term that the people in the oil industry will probably see it one way and outside others will think differently. I don't know. But a show, in my opinion, is not an oil find.[65]

Things moved very quickly at Treaty after the blacklight test. On January 28, 2012, Steve York, then the COO of Treaty, sent an update on developments at the San Juan #2 well to Reid, Blackburn, and Gwyn.[66] He stated, "Our independent logger made a visual analysis with microscope and blacklight and confirmed the presence of hydrocarbons."[67] York also wrote that a six-million-barrel reservoir size had been determined from mudlogging analysis and satellite imaging.[68] York's letter, however, did not say that Treaty had "struck oil" or that there was an estimate as to "recoverable" oil quantities. Blackburn sent an e-mail to Reid and others at Treaty the next morning, January 29, responding to York's letter:

> This is Steve's draft at saying we have found oil in Belize and a fucking lot of it. We will use certain areas of it and keep other areas for future use. I will draft a news release to send to Andrew. He will then add calculations to estimate the potential production of the current area we have found oil in and any comments he might want to add. It will then be sent to all of us plus Mike Mulshine to produce a draft news release . . . to release at 6:30 am on Monday morning.[69]

---

[64] *Id.*
[65] *Id.* at 19.
[66] (York Letter, Rec. Doc. 182-19, at 36-37).
[67] *Id.*
[68] *Id.*
[69] (Rec. Doc. 182-19, at 38).

Even before Monday, though, Mulshine began to e-mail investors, implying Treaty had struck oil. He messaged an investor affiliated with Benzinga, a stock information website, "Hey . . . Is it time for Benzinga to talk about [Treaty]? Oil in Belize Monday is going to blow it sky high!"[70] To another investor, Mulshine responded that Treaty "hit oil of commercial quality and amount . . . on their 1st Well in Belize."[71] As planned, on Monday, January 30, Treaty issued its press release, titled "Treaty Energy Corporation Strikes Oil in Belize" (the "Belize Announcement"). The by-line states in bolded lettering:

> Treaty's Drilling Team Struck Oil on its First Well on the Princess Concession in Belize Friday, January 27th at 4:30 PM-CT – This 1st Well, SAN JUAN #2, will be Put into Production Following Review by Belizean Regulatory Officials – The Stann Creek Field is Estimated to Contain 6 Million Barrels of Recoverable Oil.[72]

The body of the release states in part:

> Treaty Energy Corporation (OTCQB: TECO) (www.treatyenergy.com), a growth-oriented international energy company, today reported drilling success on its first oil well, SAN JUAN #2, in Belize, Central America. . . .

> At 1235 ft hydrocarbons were detected in the form of a gas register. This presence of C1-C4 gas readings indicated a geo-pressurized oil bearing zone/gas driven. As drilling continued the indicator steadily increased from the depth of 1235 ft with readings being taken at 1 ft intervals.

> On site analysis of the cuttings by Advanced Geological Services, Treaty's "Mud Logging" equipment supplier and consultant revealed that hydrocarbons (Oil) were present in the cuttings samples. Continued drilling showed a constant increase in hydrocarbon presence in the formation through 1290 ft, after which there was a steady decline. This defined the producing presence in the formation through 1290 ft, after

---

[70] (Pl's SOF, Rec. Doc. 182-2, at 16).

[71] *Id.*

[72] (Treaty 1.30.12 Press Release, Rec. Doc. 182-19, at 39).

which there was a steady decline. This defined the producing zone to be 1235 ft – 1290 ft.[73]

The release goes on to quote Reid as saying, "Based on our initial findings, we estimate there are about 5,000,000-6,000,000 Barrels of recoverable oil in place in this first finding."[74]

Mulshine testified that he had "no documentation, no reports" supporting the content of the press release when he published it.[75] Mulshine stated the basis for claiming Treaty had stuck oil was the York letter, a conversation with the driller Bill Harden, and a conversation with a non-expert shareholder, Sean Hickey.[76] Mulshine explained, "Andrew Reid, the Chairman and CEO, asked me and demanded that I get this filed as fast as possible."[77] Mulshine stated that he wanted the release to have a "major impact" because "I was a shareholder, too, and the shares were at one-tenth the price of what I got in at."[78]

Mohamed testified that the release "was stretching, stretching way beyond,"[79] and that the release misstated his conclusion—which was merely that there was an "oil show." When read the release's statement that the mud log "defined the producing zone to be 1235 feet through 1290 feet," Mohamed replied, "Wow. No."[80] Mohamed gave the following answers at his deposition:

---

[73] *Id.* at 39-40.
[74] *Id.*
[75] (Mulshine Tr., Rec. Doc. 182-11, at 38).
[76] *Id.* at 33.
[77] *Id.* at 37.
[78] *Id.* at 34.
[79] (Pl's SOF, Rec. Doc. 182-2, at 18).
[80] (Mohamed Tr., Rec. Doc. 182-11, at 15).

Q:   I guess at this point did you even know if there was a producing zone?

A:   No. We couldn't have. We couldn't have.

Q:   Even if there was a producing zone, would it have been 1235 to 1290 feet?

A:   Not according to this because I didn't see anything there according to the mudlog. The wireline log would have been the way to – they should have waited for the wireline log is the bottom line.[81]

On January 31, Mulshine signed and filed a Form 8-K with the Belize Announcement attached as an exhibit.[82] The Belize drilling program was subject to the oversight and regulation of the Government of Belize. The same day the Form 8-K was filed, the Belize Government issued its own release:

THE MINISTRY OF NATURAL RESOURCES AND THE ENVIRONMENT INFORMS THE GENERAL PUBLIC THAT THE INFORMATION BEING CIRCULATED TO THE MEDIA HOUSES BY TREATY ENERGY CORPORATION RELATING TO OIL DISCOVERY IN THE SAN JUAN #2 WELL IN SOUTHERN BELIZE IS FALSE AND MISLEADING.

THE MINISTRY CATEGORICALLY REFUTES THE IRRESPONSIBLE ACTIONS OF TREATY ENERGY CORPORATION IN ITS MISINFORMATION ON DRILLING SUCCESS AND THEREFORE RESPONSIBLY ADVISE THAT AN INSPECTION CONDUCTED ON THE MUDLOG AND ROCK CUTTINGS FROM THE WELL, BY THE GEOLOGY AND PETROLEUM DEPARTMENT, CONFIRMED ONLY MINUTE TRACES OF TAR WHICH IS COMMONLY OBSERVED IN ROCK FORMATIONS IN MANY WELLS PREVIOUSLY DRILLED IN BELIZE THAT WERE NOT COMMERCIAL.

IT MUST BE EMPHASIZED THAT NO LIVE OIL, IN LARGE AMOUNTS, WAS OBSERVED IN THE ROCK CUTTING WHICH NORMALLY INDICATES SOME LEVEL OF POTENTIAL AND

---

[81] *Id.*
[82] (Pl's SOF, Rec. Doc. 182-2, at 18).

WOULD REQUIRE FURTHER ANALYSIS AND TESTING TO
DETERMINE WHETHER IT IS COMMERCIALLY VIABLE.[83]

Treaty set about containing the Belize Government's release and never disclosed that the government agency overseeing its drilling program had stated it was "false" that Treaty had struck oil.[84] On February 1, 2012, Treaty issued a second release (the "Second Belize Announcement"). The Second Belize Announcement restates the contents of the York letter verbatim but begins by stating the company "hereby details its review of the first successful oil well strike by the Company."[85] The Second Belize Announcement made no reference to the Government of Belize's disclaimer. Mulshine transmitted the Second Belize Announcement to an e-mail distribution group.[86]

In the ensuing confusion an investor e-mailed Mulshine to ask, "Are we in the middle of a political squeeze play? When do you think it will blow over? This is enough to make the uninformed a bit nervous. Thanks for whatever you can tell me."[87] Mulshine replied:

> The "pot hole" has been filled! The TECO team had major mtg in Belize this morning and gave them an education on oil wells…and they now understand that our Monday release claiming an Oil Strike…is totally true. All is now fine. The stock will recover and we go forward…an unexpected buying opportunity. Life is tough![88]

---

[83] (Government of Belize Press Release 1.31.12, Rec. Doc. 182-19, at 43).
[84] (Pl's SOF, Rec. Doc. 182-2, at 20).
[85] (Treaty Press Release 2.1.12, Rec. Doc. 182-19, at 48).
[86] (Pl's SOF, Rec. Doc. 182-2, at 20).
[87] *Id.*
[88] *Id.*

Mulshine admits he assured the investor the stock would rally with "no idea whether it would actually go up."[89] "What's an investor relations guy going to say? You're trying to survive."[90] Mulshine made similar assurances that Treaty had struck oil to other investors who were worried Treaty's oil claims were bogus.[91]

Treaty was never able to produce oil from San Juan #2 well or from anywhere in Belize.[92] In July 2014, the Belize Government ordered Treaty to plug and abandon its three dry-hole wells. None of the Defendants nor Treaty ever disclosed this information.[93]

## IV.    THE WEST TEXAS OFFERING

While the Belize Venture was still ongoing, in November 2013, Treaty began an unregistered offering of purported working interests in west Texas oil wells on a mineral lease controlled by Treaty (the "West Texas Offering").[94] A Confidential Private Placement Memorandum ("PPM")[95] was drafted offering thirty-two "Units of Working Interest" in the Stockton #2 well in Taylor County, Texas.[96] Each unit represented a 3.125% working interest and a 2.3125% net revenue interest in the Stockton #2 well. The minimum purchase was for one unit at a price of $30,000. The PPM states under its "Use of Proceeds" section:

> Funds received from this purchase will be used to reimburse the company for the drilling and completion expense of the Stockton #2 well in addition to fund future and current oil and gas field developments in

---

[89] (Mulshine Tr., Rec. Doc. 182-11, at 42-43).
[90] *Id.*
[91] (Rec. Doc. 182-20, at 33-36).
[92] (Pl's SOF, Rec. Doc. 182-2, at 22).
[93] *Id.*
[94] *Id.*
[95] (PPM, Rec. Doc. 182-9, at 3-65).
[96] *Id.* at 5.

areas that the Company is already engaged in or have plans to move operations to. These areas may include Texas and Louisiana or any other unannounced areas. Funds may also be used to pay expenses and further fund Company operations on a day-to-day basis.

Funds from this particular well sale will be used to complete the Stockton #3 Lease project and begin a 25-well oil and gas development on the Lubacak lease near Ovalo, Texas.[97]

Treaty was able to attract $565,000 in investment funds for the West Texas Offering from 19 investors from Texas, Louisiana, Georgia and Utah from October 29, 2013, to February 27, 2014.[98] The SEC has filed into the record Treaty's bank records, summaries of Treaty's bank records, and a sworn declaration by Keith Hunter, a Senior Accountant with the Division of Enforcement of the SEC, demonstrating that very little of the proceeds of the sales of these units was reinvested into Treaty.[99] In his declaration, Hunter gives examples of how particular investor funds from the offering were distributed as indicated by Treaty's bank records.

For example, on October 29, 2013, Treaty opened an account at Iberia Bank to deposit investor funds from the West Texas Offering; two investor checks totaling $25,000 were deposited that same day.[100] Still the same day, $2,000 of these investor funds was disbursed to Blackburn.[101] Subsequently, another $1,500 of these funds was disbursed to Blackburn, $3,000 to Reid, $3,100 to Rampant Leon Financial Corporation (another entity controlled by Reid and Blackburn), and $1,300 to Gwyn.

---

[97] *Id.* at 28.
[98] (Pl's SOF, Rec. Doc. 182-2, at 23).
[99] (Declaration of Keith Hunter, Rec. Doc. 182-8, at 13-25) (hereinafter Hunter Decl.).
[100] *Id.* at 9.
[101] *Id.*

Of this $25,000 investment, $2,500, or 10%, was spent on oil and gas expenses. A chart provided by the SEC demonstrates how the money was distributed.

| DESCRIPTION | AMOUNT |
|---|---|
| BEGINNING BALANCE @10/29/2013 | $0.00 |
| INVESTOR FUNDS | $15,000.00 |
| INVESTOR FUNDS | $10,000.00 |
| BLACKBURN, RONALD | ($3,500.00) |
| REID, ANDREW | ($3,500.00) |
| RAMPANT LEON FINANCIAL CORPORATION | ($3,100.00) |
| GWYN, BRUCE | ($1,300.00) |
| REAL ESTATE | ($3,675.00) |
| OIL & GAS EXPENSE | ($2,500.00) |
| CONSULTING | ($2,000.00) |
| UTILITIES | ($1,000.00) |
| UNKNOWN | ($674.00) |
| PAYROLL | ($576.92) |
| CASH | ($500.00) |
| BANK FEES | ($80.00) |
| ENDING BALANCE @11/1/2013 | $2,594.08 |

This example is illustrative of how Treaty spent the investor funds for the West Texas Offering.

In January 2014, Treaty assigned all of its assets to another company.[102] Treaty's management changed later that year. Treaty had sold one of its mineral leases to a neighboring lease holder in Texas, Chris Tesarki, for $150,000, but Treaty could not transfer the lease because Treaty's interests were under sanction by the Texas Railroad Commission.[103] Tesarski took over as CEO and chairman of the board in a compromise over the debt that resulted from Treaty when it was discovered the interests could not be transferred.[104]

## V.    PROCEDURAL HISTORY

---

[102] (Letter to Shareholders, Rec. Doc. 180-20, at 46).
[103] (Pl's SOF, Rec. Doc. 182-2, at 57).
[104] *Id.*

The SEC filed its complaint against Treaty, the Officer Defendants, Lee Schlesinger, and Whitley on December 15, 2014 in the Eastern District of Texas. The case was subsequently transferred to the undersigned in July 2015. In February 2017, the Court issued an Agreed Partial Judgment as to Defendant Treaty.[105] That judgment enjoined Treaty and its officers and employees from violating securities laws. The Court also ordered disgorgement, with any civil penalty amount to be determined upon motion by the SEC.[106] In March 2017, the Court issued another Agreed Final Judgment as to Schlesinger, requiring disgorgement of $92,498.00.[107] The SEC and the remaining Defendants filed their cross-motions for summary judgment thereafter.

## PARTIES ARGUMENTS

The SEC contends that the Officer Defendants violated Section 17(a), and its subsections, of the Securities Act, 15 U.S.C. § 77q(a), which prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, which prohibits fraud in connection with the purchase or sale of any security, by making material misrepresentations or omitting material

---

[105] (Rec. Doc. 157).

[106] "In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that it did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties." (Agreed Partial Judgment as to Defendant Treaty Energy Corporation, Rec. Doc. 157, at 5-6).

[107] (Rec. Doc. 207).

facts concerning Blackburn's involvement in Treaty, the Belize Venture, and the West Texas Offering. The SEC further contends that the Officer Defendants violated Section 5(a) and (c) of the Securities Act, which prohibits the offer or sale of unregistered securities in interstate commerce unless an exemption is established. Additionally, the SEC asserts that the Officer Defendants violated Section 13(a) and Rules 13a-1, 13a-11, 13a-13, and Rule 12b-20 of the Exchange Act, which require issuers of registered securities to file accurate reports, current reports, and quarterly reports, and to disclose additional information as may be necessary to make the required statements not misleading, by aiding and abetting Treaty's alleged reporting violations.

Similarly, the SEC contends that Defendants Reid and Gwyn signed false certifications in Treaty's annual and quarterly reports in violation of Rule 13a-14 of the Exchange Act. Finally, the SEC claims that Defendants Blackburn, Reid, and Gwyn violated Section 16(a) and Rule 16a-3 of the Exchange Act, which require certain directors and officers, and persons who own more than 10% of a registered class of a company's equity securities, to file ownership and changes of ownership reports with the SEC.

The Officer Defendants' motion for summary judgment merely incorporates[108] a letter that their counsel sent to several individuals in February 2015.[109] In this letter, the Officer Defendants first contend that Treaty's announcement that it struck oil in Belize was "absolutely proper."[110] Second, the Officer Defendants argue that Blackburn did not invest $100,000 in the Belize oil project, Blackburn did not control Treaty, and Blackburn did disclose that he had a criminal history to investors.[111] Blackburn contends that Richard Daniel Bass Jr. was the investor in the Belize oil project. The Officer Defendants go on to suggest that the online blogger *tdbowieknife* wrote the SEC's complaint in this case.[112] In fact, counsel goes as far as to allege that he does "not believe that the penmanship of the Complaint was that of Senior Trial Counsel Magee. The inference that it was *tdbowieknife* ghost-writing for [Ms. Magee] is irresistible, based on the obsessive conduct by the bloggers."[113] Defendant Mulshine then contends that he did not play a managing role in Treaty and did not act with the requisite scienter necessary to prove that he violated the Securities Act. Finally, the Officer Defendants attempt to address some of the SEC's claims, but merely state

---

[108] The first eight pages of the Officer Defendants' motion for summary judgment are nonsensical. The motion first asks this Court to conduct a "NASCO Hearing" because "the SEC, in selling itself to the Hallin interests and allowing [blogger] tdbowieknife to run this litigation, has 'used' this Court as a means to commit crimes, destroy lives, and highly-likely make it possible for unknown persons and/or entities to engage in financial terrorism." (Rec. Doc. 197-2, at 6.) The Officer Defendants then ask this Court to hold a NASCO Hearing and sanction the SEC for "bringing this dishonest lawsuit and engaging in character assassination of Ron Blackburn and Bruce Gwyn in particular and the destruction of the careers of Andrew Reid and Michael Mulshine." *Id.* at 7. Notably, the first eight pages fail to address or rebut a single argument raised by the SEC in its motion for summary judgment.

[109] (Rec. Doc. 197-2, at 12).

[110] (Rec. Doc. 197-4, at 17-18).

[111] *Id.* at 18.

[112] *Id.* at 20-25.

[113] *Id.* at 25.

that no violations of the Section 5, Section 17, or Section 10 of the Securities Act occurred.[114] The common response by the Officer Defendants is "that did not happen."

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56); *accord Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its

---

[114] *Id.* at 27-28.

own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue at trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

### I. THE SEC'S MOTION TO STRIKE & THE OFFICER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before addressing the merits of the summary judgment motions, the Court will first address the SEC's Motion to Strike, which the Officer Defendants failed to oppose. The SEC moves to strike: (1) the first eight pages of the Officer Defendants' brief in support of their Motion for Summary Judgment because they are irrelevant;[115] and (2) Appendices A through H[116] attached to the Officer Defendants' Motion for Summary Judgment because they are inadmissible and not competent

---

[115] *See supra* note 108.
[116] (Rec. Docs. 197-3 to 197-10).

summary judgment evidence. The Court finds that the motion is well-taken and therefore should be **GRANTED**.

Having granted the SEC's Motion to Strike, little remains of the Officer Defendants' Motion for Summary Judgment: of the four remaining pages, two merely recite the legal standard for summary judgment. In the final two pages, the Officer Defendants argue that 17 C.F.R. § 229.401, requiring, inter alia, disclosure of criminal convictions, did not apply to Blackburn and that the SEC has "no facts regarding violations."[117] Regardless of the applicability of that specific regulation, the SEC argues that the failure to disclose Blackburn's involvement with Treaty, not merely his criminal convictions, violated the antifraud provisions of federal securities law and points to numerous instances of the Officer Defendants failing to disclose his involvement.[118] *See, e.g.*, *SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 573 (S.D.N.Y. 2001) ("To prove a violation of § 10(b) and Rule 10b-5, the [SEC] must prove . . . that, in connection with the purchase or sale of any security, defendants, acting with scienter . . . made an untrue statement of a material fact or [failed] to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading."). The Officer Defendants have failed to establish that they are entitled to judgment as a matter of law and, accordingly, their Motion for Summary Judgment is **DENIED**.

## II.    SECTION 5(A) AND (C) OF THE SECURITIES ACT

---

[117] (Rec. Doc. 197-2, at 11).
[118] (Rec. Doc. 182-1, at 17-18).

The SEC's first claim is that each of the Defendants violated Sections 5(a) and (c) of the Securities Act. Section 5(a) and (c) of the Securities Act make it unlawful to offer or sell a security in interstate commerce unless a registration statement has been filed or the transaction qualifies for an exemption from registration. 15 U.S.C. § 77e(a), (c); *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013). To establish a prima facie case against each Defendant for violating Section 5, the SEC must produce competent summary judgment evidence establishing that (1) no registration statement was in effect as to the securities; (2) the Defendant sold or offered to sell these securities; and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale. *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Section 5 is a strict liability statute; there is no need to prove scienter. *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980) ("The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities . . . regardless of any . . . degree of fault, negligent or intentional, on the seller's part.").

Moreover, the prohibition on the sale or attempted sale of securities has broad reach. *CMKM Diamonds, Inc.*, 729 F.3d at 1255 ("[L]iability under Section 5 is not limited to the person or entity who ultimately passes title to the security."). It extends to significant "participants" in the sale, those who were both necessary for a transaction and a "significant factor" in bringing it about. *Id.* (citing *SEC v. Murphy*, 626 F.2d 633, 650 (9th Cir. 1980)).

If the SEC establishes a prima facie case, then the burden shifts to the Defendants to prove that they are entitled to an exemption. *SEC v. Ralston Purina*, 346 U.S. 119 (1953); *Cont'l Tobacco*, 463 F.2d at 156. The Court will address the merits of the SEC's claims against each of the Defendants in turn.

### A.  Blackburn Violated Section 5

Blackburn violated Section 5(a) and (c) by offering and selling his initial, unregistered shares and by offering and selling S-8 shares on Treaty's behalf. Regarding the first element, the SEC's Records Officer attested that "no registration statements were filed with [the SEC] between 2009 to [March 10, 2017], under the name of Treaty Energy Corporation . . . other than the Form S-8 registrations filed on February 23, 2011, August 24, 2012 and February 21, 2013."[119] Therefore, the SEC may satisfy the first element by showing that these S-8 form filings did not serve as valid registrations of the securities. *See SEC v. E. Delta Res. Corp.*, No. 10-CV-310 SJF WDW, 2012 WL 3903478, at *4 (E.D.N.Y. Aug. 31, 2012), *aff'd*, 550 F. App'x 52 (2d Cir. 2014). "[A]n S–8 registration form can be used by a company only to issue stock as a means of compensating consultants for bona fide services not connected with raising capital." *Phan*, 500 F.3d at 903. If the SEC can show that Blackburn did not perform bona fide services in exchange for any Treaty shares, or that Blackburn was issued shares primarily in order to raise capital on behalf of Treaty, then there was no effective registration statement applicable to *any* of Treaty's shares, including those purportedly registered under S-8. *See E. Delta Res.*, 2012 WL 3903478, at *4.

---

[119] (Rec. Doc. 182-18, at 38).

At formation, Blackburn possessed 397,440,000 of Treaty's shares, an 86.4% interest, and the evidence in the record confirms Blackburn offered and sold most of those shares to investors. Blackburn freely admitted at deposition that he sold his shares on behalf of Treaty in order to raise capital for the company.[120] He testified that he would call investors in an attempt to receive money to develop oil and gas wells.[121] After he spoke with these investors on the phone, Blackburn would sell them his shares and they would wire the money directly to Treaty.[122] In fact, this arrangement was the means by which Treaty entered into the Belize Venture. Therefore, the SEC has easily proven the first element: Blackburn's initial shares were unregistered and to the extent the S-8 shares were intended to compensate Blackburn as a "consultant," it was primarily for his capital-raising and promotional role. *See E. Delta Res.*, 2012 WL 3903478, at *5; *see also Registration of Securities on Form S-8,* Release No. 7646 (S.E.C. Release No. Feb. 25, 1999). The same evidence also satisfies the second element: Blackburn sold and offered the unregistered securities.

Finally, the third element is met. The SEC has provided a detailed accounting of the distributions of shares by Blackburn to individuals across the United States.[123] This accounting was produced by reference to the internal transfer ledgers created by Mulshine to track the millions of shares transferred from Treaty, through

---

[120] (Blackburn Trsn., Rec. Doc. 182-10, at 109).

[121] *Id.*

[122] *Id.*

[123] (Transfers of Shares by Ronald Blackburn, Rec. Doc. 182-8, at 29-34) (hereinafter SEC Transfers Ledger).

Blackburn, to investors from February 2009 to June 2013.[124] Blackburn has provided absolutely no evidence to suggest that the hundreds of thousands of shares he admits he sold to raise capital for Treaty were limited to intrastate commerce. Moreover, evidence that Blackburn actually sold unregistered stock in interstate commerce is sufficient but not necessary: the jurisdictional nexus can be met simply by showing that the means of interstate commerce—telephones, e-mail, and the mail—were used to communicate with investors, potential investors, transfer agents, or broker-dealers. *See SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997) ("The third element of a Section 5 violation, requiring the use of interstate means in connection with the sale or offering of a security, 'is broadly construed to include . . . intrastate telephone calls.'"). It is clear from the record that Blackburn used these devices; therefore, this element is met.

Accordingly, the SEC has presented a prima facie case that Blackburn sold and offered unregistered shares by means of interstate commerce. Blackburn has not argued that a specific exemption to registration applies in this case and, upon examining the record, it is clear that no exemption applies.[125]

---

[124] (Mulshine Ledger, Rec. Doc. 182-8, at 35-37).

[125] The only possibly relevant exemption is Section 4(a)(1), which provides that the registration requirements of Section 5 do not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). An "issuer" is "'every person who issues or proposes to issue any security.'" *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (quoting 15 U.S.C. § 77b(a)(4)). An "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." § 77b(a)(11). "'Any intermediary between the issuer and the investor that is an essential cog in the distribution process may be a statutory underwriter.'" *Platform Wireless Int'l Co.*, 617 F.3d at 1086 (quoting Thomas Lee Hazen, *Federal Securities Law* 44 (2d ed. 2003)). Thus, as long as Blackburn qualifies as an issuer, underwriter, or dealer, the exemption would not apply. Blackburn testified that it was his expectation that the shares he received from Treaty were going to be used to pay back investors who contributed funds to help

## B.     Reid Violated Section 5

Reid also violated Section 5(a) and (c) by directly offering and selling Blackburn's shares to investors. As noted above, the first element is met because none of Treaty's shares were registered for a general capital raising purpose. Proceeding to the second and third elements, the Court finds that these are easily confirmed by Reid's deposition testimony.

Reid testified that in the early days of Treaty—from 2009 to 2010—Treaty did not have any registered stock that it could sell, so the only way it could raise money through stock sales was by selling Blackburn's stock.[126] The "bulk" of the money coming into Treaty at this time was from investors.[127] According to Reid, Blackburn would "loan" his shares to Treaty to facilitate a sale.[128] Investors would pay for the securities through Treaty, and Blackburn would then have the shares issued to the investors.[129] In order to procure investors, either Reid or Blackburn would contact and solicit sales to investors.[130] Reid agreed that soliciting or attracting new investors to Treaty was one of his duties as CEO and president of Treaty.[131] He further admitted part of his work at Treaty was "reaching out to investors, current investors, talking with them and trying to raise capital.[132] Moreover, there is unrefuted

---

Treaty grow as a company. (Blackburn Tr., Rec. Doc. 182-10, at 107). In other words, when Treaty issued Blackburn stock, Blackburn "had a view to" turn around and sell that stock to investors in exchange for capital. It follows that Treaty was the original issuer of the stock, and Blackburn was at least an underwriter of those shares when he later distributed them in exchange for "investments." Accordingly, this commonly-applied exemption does not apply.

[126] (Reid Tr., Rec. Doc. 182-11, at 60).
[127] *Id.* at 58.
[128] *Id.* at 60.
[129] *Id.*
[130] *Id.*
[131] *Id.* at 57.
[132] *Id.*

evidence that Reid solicited Chris Ezzell to purchase Blackburn's unregistered Treaty shares, and that Ezzell purchased shares.[133]

Thus, the SEC has demonstrated a prima facie case that Reid directly solicited and sold Treaty's unregistered securities through means of interstate commerce.[134] Reid has failed to allege, let alone demonstrate, that an exemption applies to his sale of these securities, that the securities were registered, or that the sale of these unregistered securities was not made through interstate commerce. The SEC is entitled to summary judgment on its Section 5 claim against Reid.

## C.    Gwyn Violated Section 5

Gwyn, like Blackburn and Reid, admitted in his deposition that he sold Treaty shares on behalf of the company in order to raise capital for Treaty. When asked, "Did you sell shares of Treaty Energy to [an investor]?" Gwyn replied, "Yes, I did."[135] As Gwyn explained, "The only way the operations would continue to go is if we brought money in because we didn't have enough revenue."[136]

Further, it is undisputed that these shares were unregistered and that checks would arrive in the mail for the purchase of such stock. Thus, the SEC has established a prima facie case against Gwyn, and the burden shifts to Gwyn to demonstrate that an exemption applies in this case or to disprove any of the SEC's arguments. He has not done so. Accordingly, the SEC is entitled to summary judgment on its Section 5 claim against Gwyn.

---

[133] (*See* Ezzell Decl., Rec. Doc. 182-5, at 4-5).
[134] (*See* Reid Tr., Rec. Doc. 182-11, at 58).
[135] (Gwyn Tr., Rec. Doc. 182-11, at 7).
[136] *Id.*

### D. Mulshine Violated Section 5

Mulshine violated Section 5 of the Securities Act by soliciting investors to purchase unregistered Blackburn shares. The SEC filed the sworn declaration of Jefferey Morgan, a Contract Specialist for the U.S. Army who invested in Phoenix and later in Treaty.[137] Morgan had been an investor in Phoenix and he knew Mulshine and Blackburn from their time there. Mulshine contacted Morgan in 2008 by telephone to solicit his investment in Treaty, which he said was raising $200,000 for oil well repairs that would quadruple the wells' output.[138] Morgan voiced concern that Blackburn might be involved—Morgan had learned Blackburn was a felon—but Mulshine assured Morgan that Blackburn was not associated with Treaty.[139] Morgan agreed to invest in the well and wired $30,000 to a Regions account according to Mulshine's instructions.[140] Morgan was issued a convertible promissory note, which converted to 780,320 shares of Treaty common stock.[141] Morgan later learned of Blackburn's involvement and sold his shares for a loss of approximately $18,800.[142]

Accordingly, this evidence indicates that Mulshine was involved in the sale of unregistered Treaty stock and that the sale and offer were made through interstate commerce. Further, Mulshine has not argued, nor produced any evidence, that an exemption to registration applies in this case. Therefore, the SEC is entitled to summary judgment on its claim that Mulshine violated Section 5.

---

[137] (Declaration of Jefferey Morgan, Rec. Doc. 182-7, at 14-18) (hereinafter Morgan Decl.).
[138] *Id.* at 16.
[139] *Id.*
[140] *Id.* at 17.
[141] *Id.*
[142] *Id.* at 17-18.

### III. SECTION 10(b) OF THE EXCHANGE ACT, RULE 10b-5, AND SECTION 17(a) OF THE SECURITIES ACT

The SEC alleges that Blackburn, Reid, Gwyn, and Mulshine committed multiple acts of fraud under both the Securities Act and the Exchange Act. To prove a violation of the Exchange Act's Section 10(b)[143] and the corresponding Rule 10b-5,[144] the SEC is required to show, by a preponderance of the evidence, that each of the Defendants "(1) made a misstatement or omission (2) of material fact (3) in connection with the purchase or sale of securities (4) with . . . 'a mental state embracing intent to deceive, manipulate, or defraud.'"[145] *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).

---

[143] Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Congress enacted § 10(b) 'to insure honest securities markets and thereby promote investor confidence.'" *Chadbourne & Parke, LLP v. Troice*, 571 U.S. 377, 403 (2014) (citation omitted).

[144] Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

[145] "The scope of liability under Section 10(b) and Rule 10b-5 is the same." *SEC v. Sethi*, 910 F.3d 198, 206 n.4 (5th Cir. 2018), *cert. denied*, No. 19-5113, 2019 WL 4923028 (Oct. 7, 2019).

A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest," *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018), *cert. denied*, No. 19-5113, 2019 WL 4923028 (Oct. 7, 2019) (internal quotation marks and citation omitted), or if there is a substantial likelihood that the misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). Normally, whether an omission is material is resolved by the trier of fact, but when "the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality,'" summary judgment may be appropriate. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (citation omitted).

When considering the third element, "the Supreme Court has 'espoused a broad interpretation' of the phrase 'in connection with' in the context of Section 10(b) and Rule 10b-5." *SEC v. Wey,* 246 F. Supp. 3d 894, 913 (S.D.N.Y. Mar. 27, 2017) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else.")); *see also SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) ("We have said that the 'in connection with' requirement is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" (citation omitted)).

The last element is the scienter requirement. Scienter is demonstrated when a party acts with severe recklessness or an intent to deceive. *SEC v. Seghers,* 298 F. App'x 319, 333 (5th Cir. 2008) (citing *Nathenson,* 267 F.3d at 408).[146] When scienter is at issue, courts rarely grant summary judgment because of the element's subjective nature. *See* Thomas Lee Hazen, *Treatise on the Law of Securities Regulation*, § 12:52 (2019) (collecting cases). However, courts nevertheless may find scienter as a matter of law where the defendant's recklessness with the truth is obvious from the facts and the defendant has failed to set forth any contrary evidence as to his state of mind. *See Sethi*, 910 F.3d at 207-08 & n.5.

Section 17(a) of the Securities Act makes it unlawful:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q. "Claims under Section 17(a) of the Securities Act have essentially the same elements as those under Exchange Act Section 10(b) and Rule 10b–5." *SEC v. Yorkville Advisors*, *LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018). "However, the mens rea elements of Section 17(a)'s three subsections differ. Claims brought under

---

[146] In *Seghers*, the Fifth Circuit also noted that, in proving scienter, "'[t]he party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information.'" *Seghers*, 298 F. App'x at 327 (citation omitted). Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Nathenson*, 267 F.3d at 408 (citation omitted).

Section 17(a)(1) require proof of scienter, while claims brought under Sections 17(a)(2) or (3) only require proof of negligence." *Id.*; *see also Sethi*, 910 F.3d at 206.

The SEC contends that the Officer Defendants violated the above provisions in four ways: (1) by failing to disclose Blackburn's role in Treaty; (2) by engaging in a false promotional campaign to artificially inflate the price of Treaty's stock; (3) by conducting an illegal and unregistered offering of oil and gas interests and misappropriating investor proceeds; and (4) by making material misrepresentations to Treaty's investors.[147] The Court will address each argument in turn.

### A. Mulshine, Reid, and Gwyn Violated Section 10, Rule 10b-5, and Section 17(a) by Failing to Disclose Blackburn's Role in Treaty

The SEC argues that the Officer Defendants violated Section 10, Rule 10b-5, and Section 17(a) by failing to disclose Blackburn's role in Treaty because a reasonable investor would have considered knowing Blackburn's role in Treaty an important factor in deciding whether to invest in light of his criminal convictions for various tax offenses, the lawsuit against him by Phoenix's bankruptcy trustee accusing him of misappropriating nearly $1.9 million from the company, and the immense level of control he exercised over Treaty even though he was prohibited from being an officer or director because of his felony convictions.[148] The SEC points to statements made to Morgan,[149] one of Treaty's investors, and Treaty's 2011 and 2012 Form 10-K as specific instances of their omissions.[150]

---

[147] (Rec. Doc. 182-1, at 13-29).
[148] *Id.* at 14-17.
[149] *See supra* Part II.D.
[150] *Id.* at 15, 17.

Morgan, an investor who knew Blackburn and Mulshine from their time at Phoenix and specifically knew that Blackburn was a convicted felon, was approached by Mulshine about investing in Treaty and told Mulshine that he did not want to invest if Blackburn was involved with Treaty.[151] Mulshine assured him that Blackburn was not involved with Treaty and that Treaty was funded by "TK Holdings," a large investment group that wanted to remain anonymous.[152] However, upon learning that Blackburn was involved and that TK Holdings was a company owned and controlled by Blackburn, Morgan sought to sell his shares and eventually did so for a loss of approximately $18,800.[153] Morgan specifically testified, "If I had been told the true nature of Blackburn's involvement in Treaty or how my funds would be used, I would never have made my investment in Treaty."[154]

Thus, the SEC has shown that Mulshine violated Section 10, Rule 10b-5, and Section 17(a) by misrepresenting Blackburn's involvement in Treaty to Morgan. This misrepresentation was obviously material because Morgan conditioned his investment in Treaty on Blackburn not being involved, based in part on his knowledge of Blackburn's criminal convictions. Jeffrey Mercer, another investor, likewise testified that he "would have been unlikely to invest in" Treaty had he known of Blackburn's felon status.[155] *See Enters. Sols.,* 142 F. Supp. 2d at 573 (finding omission of a defendant's "significant participation in the company" to be material

---

[151] (Morgan Decl., Rec. Doc. 182-7, at 16).
[152] *Id.*
[153] *Id.* at 17-18.
[154] *Id.* at 18.
[155] (Declaration of Jeffrey Mercer, Rec. Doc. 182-7, at 6) (hereinafter Mercer Decl.).

because of his "extensive history of criminal and regulatory violations"). Mulshine made the misrepresentation about Blackburn's involvement as part of his effort to get Morgan to invest in Treaty, which Morgan eventually did. Finally, scienter is established because Mulshine clearly knew that Blackburn was intimately involved with Treaty and has offered no other explanation for his statement. *See Sethi*, 910 F.3d at 207-08. Therefore, the SEC has proved that Mulshine acted with at least severe recklessness with the truth and is entitled to summary judgment on this claim.

Additionally, Reid and Gwyn violated Section 10, Rule 10b-5, and Section 17(a) by failing to disclose Blackburn's involvement with Treaty on Treaty's 2012 Form 10-K. The SEC argues that disclosure of Blackburn's involvement was required under SEC Regulation S-K, which sets forth the disclosure requirements for reports filed with the SEC, including Form 10-K. Item 401 of Regulation S-K requires that an issuer list the names of all directors, executive officers, and significant employees of the company and provide a brief description of the business experience of each one. 17 C.F.R. § 229.401(a)–(c), (e). Exchange Act Rule 3b-7 defines "executive officer" as a registrant's "president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration, or finance) any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." 17 C.F.R. § 240.3b–7. Item 401 defines "significant employees" as persons "who make or are expected to make significant contributions to the business of the registrant." 17 C.F.R. § 229.401(c).

In *SEC v. Enterprises Solutions, Inc.*, the court found that the defendants violated Rule 10b-5 by not disclosing the significant participation in the company of one of the defendants who was labeled a "consultant" but whose activities were sufficiently similar to the duties of an officer or director of the company. 142 F. Supp. 2d at 573-74. These activities included supplying the initial investment, providing management leadership, negotiating the acquisition of another company, drafting and negotiating employment agreements, recruiting for executive positions, negotiating loans for the company, and arranging sales of stock to investors. *Id.* at 568-70. The court further found that this omission was material due to the consultant's "extensive history of criminal and regulatory violations." *Id.* at 573.

Here, the SEC has provided evidence that Blackburn (1) hired or appointed the company's officers and directors, including Reid and Mulshine;[156] (2) directed Treaty's investor relations by controlling the content and timing of press releases;[157] (3) led Treaty's acquisitions and fundraising efforts;[158] (4) sold his personal shares to raise money for Treaty;[159] (5) negotiated loans on Treaty's behalf;[160] (6) used the proceeds from the sale of his Treaty stock to pay Treaty's expenses;[161] (7) deposited the proceeds from some of the sales of his Treaty stock into Treaty's bank accounts;[162] (8) pledged his Treaty stock as collateral for one or more loans made to Treaty;[163] and (9)

---

[156] (Blackburn Tr., Rec. Doc. 182-10, at 113, 115-16; *see also* Rec. Doc. 182-18, at 59, 61-62).
[157] (Blackburn Tr., Rec. Doc. 182-10, at 120-21, 128).
[158] *Id.* at 106-07, 113.
[159] (*Id.* at 119; Reid Tr., Rec. Doc. 182-11, at 60).
[160] (Rec. Doc. 182-18, at 58).
[161] (Blackburn Tr., Rec. Doc. 182-10, at 119; Rec. Doc. 182-18, at 58).
[162] (Blackburn Tr., Rec. Doc. 182-10, at 119; Rec. Doc. 182-18, at 58).
[163] (Rec. Doc. 182-18, at 58-59).

met with the Government of Belize on multiple occasions to actively manage Treaty's interests in Belize.[164] Additionally, Blackburn maintained a permanent office in the same suite as Treaty's other officers, immediately adjacent to Reid's.[165] Yet despite this, the only disclosure of Blackburn's involvement is his status as a beneficial owner.[166] Additionally, Reid and Gwyn admitted that several references to a "major shareholder," "affiliate," or "related party" in the Form 10-K were references to Blackburn, such as the following statement: "[O]n June 22, 2011, we issued an affiliate 77,258,753 shares as reimbursement for personal shares the affiliate used in various deals in Belize, Tennessee, Louisiana and Texas."[167]

Thus, Reid and Gwyn violated Section 10, Rule 10b-5, and Section 17(a) by failing to disclose Blackburn's significant involvement with Treaty on Treaty's 2012 Form 10-K. Reid and Gwyn are liable as the makers of the statement because they both signed the Form 10-K, certifying that all statements therein were truthful and did not omit any material fact.[168] This omission was material given Blackburn's significant participation in the management of Treaty and his criminal history. *See Enters. Sols.,* 142 F. Supp. 2d at 573. The omission was made in connection with the purchase or sale of securities because Form 10-K is a required filing for every issuer of registered securities. *See, e.g.,* 15 U.S.C. § 78m(a). Finally, the omission was made with the intent to deceive, as Reid and Gwyn knew that Blackburn could not be an

---

[164] (Blackburn Tr., Rec. Doc. 182-10, at 119).

[165] (*Id.* at 114; Reid Tr., Rec. Doc. 182-11, at 56).

[166] (Treaty 2012 Form 10-K, Rec. Doc. 182-15, at 9). A beneficial owner is a person who owns 5% or more of an entity's common stock; Blackburn is listed as owning 7.7%.

[167] (Rec. Doc. 182-18, at 50-53; *see also* Treaty 2012 Form 10-K, Rec. Doc. 182-13, at 8).

[168] (Treaty 2012 Form 10-K, Rec. Doc. 182-15, at 12, 14-17).

officer or director because of his felony convictions yet exerted a high degree of control over the management of Treaty. They also knew that several statements referred specifically to Blackburn but concealed that fact using vague language. By failing to disclose Blackburn's involvement, Reid and Gwyn misled buyers about the potential risks associated with investing in Treaty. *See Sethi*, 910 F.3d at 207-08.

## B. Mulshine and Reid Committed Violations by Misrepresenting that Treaty Struck Oil in Belize

Mulshine also violated Section 10, Rule 10b-5, and Section 17(a) by misrepresenting that Treaty had struck oil in Belize, even after the Belize Government confirmed it had not and denounced Treaty's press release as false and misleading. Additionally, Reid violated Section 17(a) by making misrepresentations in connection with the Belize Announcement.

There is no dispute that these claims were false: Treaty was never able to produce oil from the San Juan #2 well or anywhere else in Belize.[169] Mohamed, Treaty's mudlogger whose reports were the basis for the Belize Announcement, agreed with the Belize Government's characterization of the announcement as irresponsible and misleading.[170] Mohamed also explained that the mere presence of hydrocarbons, or an "oil show," was not equivalent to discovering recoverable quantities of oil.[171] He testified that, at the point the Belize Announcement was released, Treaty did not have enough information to know whether it had struck oil,

---

[169] (Reid Tr., Rec. Doc. 182-11, at 76).
[170] (Mohamed Tr., Rec. Doc. 182-11, at 17).
[171] *Id.* at 19.

let alone estimate the amount of recoverable oil without additional testing.[172] Further, he flatly rejected the Belize Announcement's characterization of his findings as defining the producing zone to be 1235 feet through 1290 feet, testifying that they could not have known whether a producing zone even existed without additional testing.[173]

There is also no dispute that these misrepresentations were material: Treaty was an oil company, and as such, any reasonable investor would consider the fact that Treaty's announcement about striking oil in Belize was false to be important. *See Sethi*, 910 F.3d at 206.

The misrepresentations were made in connection with efforts to sell Treaty stock. Prior to the publication of the Belize Announcement, Mulshine emailed several investors touting the impending news. He admitted he wanted the release to have a "major impact" in order to increase the price of Treaty's shares.[174] After the Belize Government issued its press release, Treaty issued the Second Belize Announcement, which continued to describe the Belize venture as Treaty's "first successful oil well strike" and made no mention of the Belize Government's release.[175] Additionally, Mulshine emailed multiple investors and a reporter to assure them that the oil strike was real and the Belize Government's release was inaccurate.[176] Further, Treaty's stock price and trading volume dramatically increased after the first Belize

---

[172] *Id.* at 13.
[173] *Id.* at 15.
[174] (Mulshine Tr., Rec. Doc. 182-11, at 34).
[175] (Treaty Press Release 2.1.12, Rec. Doc. 182-10, at 39).
[176] (Rec. Doc. 182-20, at 31-34).

Announcement and rebounded from a decline caused by the Belize Government's release after the Second Belize Announcement.[177] Thus, the misrepresentations did far more than "coincide" with the sale of securities; they fueled the increase in trading volume and price of Treaty's stock. *Dabit*, 547 U.S. at 85.

Finally, Mulshine and Reid made these misrepresentations with the requisite mental state. Even after the Belize Government issued its press release stating that Treaty's claim was false, Mulshine continued to assert that Treaty had struck oil and that the Belize Government was wrong. He testified that he believed the Belize Government's authorization for Treaty to continue drilling amounted to it agreeing that Treaty's claims of striking oil were true, even though the Belize Government refused to make a public statement to that effect.[178] His misrepresentation that the Belize Government had changed positions on Treaty's claim of striking oil created a "danger of misleading buyers" that their claims were supported by the Belize Government when in fact they were not. *Nathenson*, 267 F.3d at 408. Thus, the SEC has established that Mulshine acted with severe recklessness in making these misrepresentations.

Reid had no experience or training in the oil and gas industry prior to coming to Treaty yet admitted that he did the calculations to estimate the amount of recoverable oil himself, using a software program that he could not identify at his deposition.[179] He testified that he performed the calculations based on data he

---

[177] (Hunter Decl., Rec. Doc. 182-8, at 19-20).
[178] (Mulshine Tr., Rec. Doc. 182-11, at 44).
[179] (Reid Tr., Rec. Doc. 182-11, at 55, 75).

received from York as well as conversations he had with York and Mohamed but could not recall talking with anyone in Belize about the findings or whether Treaty conducted an independent evaluation of the data.[180] Reid also testified that he believed the statement in the York letter indicating the presence of hydrocarbons meant that Treaty had struck oil (which Mohamed explained was incorrect).[181]

Additionally, because Reid had ultimate authority over the Belize Announcement,[182] Reid may be liable for the misrepresentations therein as the maker of those statements. *See SEC v. Carter*, No. 10-C-6145, 2011 WL 5980966, at *2 (N.D. Ill. Nov 28, 2011) (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)). This includes the statement describing the producing zone to be 1235 feet through 1290 feet, which Mohamed testified could not have been known at that time. In light of Reid's lack of training and experience in the oil and gas industry, his failure to independently verify the results, and Mohamed's testimony that additional testing was required to determine whether there was even recoverable oil present, the SEC has shown that Reid was at least negligent and therefore violated Section 17(a)(2)–(3). *See Sethi*, 910 F.3d at 206. However, the SEC has failed to present sufficient facts to show either intentional misrepresentation or severe recklessness as required by Section 10(b), Rule 10b-5, and Section 17(a)(1).

Furthermore, the SEC has failed to prove that Blackburn violated Section 10, Rule 10b-5, and Section 17(a) with respect to the Belize Venture. While the SEC

---

[180] *Id.* at 74-77.
[181] *Id.* at 74.
[182] *Id.* at 75 ("Q. Did you approve the final draft of this press release? A. I did.").

claims that Blackburn did so "by falsely claiming that studies had confirmed that the Belize concession contained millions of barrels of oil,"[183] it fails to cite to any evidence in the record that Blackburn actually made such a statement. Accordingly, the SEC has failed to carry its burden on this claim against Blackburn. The Court will allow the SEC to file a motion within twenty-one days of this order to properly support or address these facts. *See* FED. R. CIV. P. 56(e)(1).

### C. The SEC Has Failed to Prove Any Violations of Section 10, Rule 10b-5, and Section 17(a) in Connection with the West Texas Offering

The SEC contends that Reid, Blackburn, and Gwyn made material misrepresentations in the PPM for the West Texas Offering because only $24,000 of the $565,000 raised from investors was spent on oil and gas expenses, with large amounts going to Reid, Blackburn, and Gwyn personally and the remainder being spent on various other expenses. However, the SEC has failed to convincingly argue that the PPM even constitutes a misrepresentation.

The PPM provided that any funds would be used (1) to reimburse Treaty for expenses from the Stockton #2 well; (2) to fund current and future oil and gas development; and (3) "to pay expenses and further fund Company operations on a day-to-day basis."[184] In light of the catchall provision, it is not immediately apparent to the Court that expenditures for consulting, legal, credit cards, accounting, loan payments, commissions, and other miscellaneous expenses (which, according to the

---

[183] (Rec. Doc. 182-1, at 23).
[184] (PPM, Rec. Doc. 182-9, at 28).

numbers presented by the SEC, amounted to over 40% of the funds raised)[185] constituted a misuse of investor funds.

The SEC relies on *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp 3d 379 (S.D.N.Y. 2014), to suggest that the catchall provision is "meaningless" and constitutes a material omission. That case is readily distinguishable. There, the defendant argued that the statement that funds raised would be used "for general corporate purposes, which may include working capital" was broad enough to encompass payments to third parties who were related to officers of the corporation but provided no work for the corporation. *Id.* at 391. The court rejected this argument, stating that the proposed definition was "so broad as to render the phrase 'general corporate purposes' meaningless." *Id.* Significantly, the court in that case was resolving a motion to dismiss, not a motion for summary judgment. *See id.* at 386.

The SEC makes much of the payments to Blackburn ($81,737.39), Reid ($63,500), Gwyn ($42,087), and Rampant Leon ($40,420), another corporation controlled by Blackburn and Reid.[186] However, the SEC fails to tie the facts to the law and carry its burden of persuasion on this claim. This is also evident for the scienter element, for which the SEC offers precious little evidence. The SEC insists that "the immediate and substantial withdraws of investor funds that went to" Blackburn, Reid, and Gwyn "evidences a high degree of scienter."[187] Far from it: Defendants' actions when they received funds from investors does not necessarily

---

[185] (*See* Rec. Doc. 182-1, at 24).
[186] *See id.*
[187] *Id.* at 25.

bear on their state of mind when they earlier made statements soliciting funds from those investors. *See, e.g.*, *Gann*, 565 F.3d at 936 ("The SEC was required to show . . . that the defendant . . . made a misstatement . . . with scienter."). The SEC offers no evidence that Blackburn, Reid, and Gwyn intended to misuse investor funds when the statements in the PPM were made.

The SEC asks the Court to draw an adverse inference from Gwyn's invocation of the Fifth Amendment in lieu of testifying at his deposition.[188] "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Thus, the defendant's "refusal to testify may be used against him in a civil proceeding." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983). While an adverse inference may be recognized at the summary judgment stage, the movant may not rely solely on the other party's exercise of his Fifth Amendment rights to carry its burden. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 n.3 (5th Cir. 1990). Accordingly, the adverse inference against Gwyn is insufficient for the SEC to carry its burden on this claim. *See id.* at 119 (affirming grant of summary judgment for defendant where non-moving party "failed to present any other evidence to bolster the [adverse] inference").

### D. Reid and Gwyn Violated Section 10, Rule 10b-5, and Section 17(a) by Making Misrepresentations to Certain Investors

*1. Chris Ezzell*

---

[188] (*See* Declaration of Bruce Gwyn, Rec. Doc. 182-11, at 133; Rec. Doc. 182-12, at 1).

Reid convinced Ezzell to invest in Treaty by telling him that Koch Industries had invested $300 million in Treaty and to not sell his Treaty stock after Ezzell learned that Treaty was being investigated by the SEC by telling him that Treaty was suing the SEC for $33 million and Reid would pay him from those funds when they received them.[189] Both of those statements were false. Reid testified that there were no major companies who invested in Treaty.[190] There is also no record evidence of a lawsuit by Treaty (or its shareholders, as Defendants suggest in their opposition) against the SEC, nor has the Court been able to independently locate such records.

These misrepresentations were material. A reasonable investor would consider the fact that a major company had invested hundreds of millions of dollars important in making a decision to invest because it would increase the investor's confidence that the investment was likely to be profitable, particularly where the investor was only considering investing a significantly smaller sum. *See Sethi*, 910 F.3d at 206. Likewise, learning that Treaty did not have a pending lawsuit expected to recover millions of dollars would be viewed by a reasonable investor as significantly altering the "total mix" of information made available. *Basic*, 485 U.S. at 231-32.

Reid made these misrepresentations in connection with the purchase or sale of securities. He made the misrepresentation about Koch Industries to convince Ezzell to invest and purchase Treaty stock, and he made the misrepresentation about the lawsuit to convince Ezzell not to sell his Treaty stock.[191]

---

[189] (Ezzell Decl, Rec. Doc. 182-5, at 4, 9).
[190] (Reid Tr., Rec. Doc. 182-11, at 59).
[191] (Ezzell Decl, Rec. Doc. 182-5, at 4, 7-9).

Finally, Reid made these misrepresentations with scienter. As noted above, Reid admitted that no major companies had invested in Treaty, and he offers no evidence that Koch Industries invested any amount of money in Treaty and no explanation for his statement.[192] Likewise, he offers no explanation or defense for his statement about the fictional lawsuit. *See Sethi*, 910 F.3d at 207-08.

### 2. George Demmas

Gwyn convinced George Demmas to invest $15,000 in Treaty by telling him that "the share purchase was not risky, because Treaty had a proven record of success, including profitable wells in West Texas."[193] This statement was false; Treaty had not had a successful private placement offering at that time.[194] This misrepresentation was material, as a reasonable investor would consider a company's past record of success (or lack of it) important in making a decision to invest. *See Sethi*, 910 F.3d at 206. The third element is met because Gwyn made the misrepresentation to persuade Demmas to purchase Treaty stock, which he did.[195]

Finally, the Court concludes that Gwyn acted with scienter in making the misrepresentation. Defendants have not offered any evidence to show that Gwyn's statement was true or that he had reason to believe it was true, nor have they offered any cogent legal argument in opposition to this claim.[196] Additionally, an adverse

---

[192] (*See* Rec. Doc. 194, at 43).

[193] (Declaration of George Demmas, Rec. Doc. 182-6, at 21) (hereinafter Demmas Decl.). The SEC also contends that Gwyn committed violations by making misrepresentations to Demmas concerning his investment in Rampant Leon Financial Corporation, another corporation controlled by Blackburn and Reid; however, these allegations are outside the scope of the complaint and therefore the Court will not consider them.

[194] (Reid Tr., Rec. Doc. 182-11, at 63).

[195] (Demmas Decl., Rec. Doc. 182-6, at 20; Rec. Doc. 182-7, at 2-3).

[196] (*See* Rec. Doc. 194, at 43-44).

inference against Gwyn is appropriate here and further bolsters the SEC's position. *See Farace*, 699 F.2d at 210; *cf. Gutterman*, 896 F.3d at 119. Accordingly, the SEC has shown that Gwyn violated Section 10, Rule 10b-5, and Section 17(a).

In sum, the SEC has established that Reid, Gwyn, and Mulshine each violated Section 10(b), Rule 10b-5, and Section 17(a). Significant, however, the SEC has failed to establish that Blackburn committed a violation of Section 10, Rule 10b-5, or Section 17(a).

## IV.   AIDER AND ABETTOR LIABILITY UNDER EXCHANGE ACT SECTION 13(A)

The SEC claims that Treaty violated Section 13(a) of the Exchange Act and Rule 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by filing reports on Forms 10-L, 10-Q, and 8-K that (1) failed to disclose Blackburn's role in the company and (2) contained materially false and misleading statements about the Belize oil strike. The SEC argues that Blackburn aided and abetted Treaty's reporting violations by mandating that Treaty not disclose his true role at the company and by telling the other officers that he could not be an officer or director because of his felonies. The SEC contends that Reid and Gwyn aided and abetted Treaty's reporting violations by approving and signing Treaty's filings when they knew the periodic and current filings failed to disclose Blackburn's true role at the company. Finally, the SEC argues that Mulshine aided and abetted Treaty's alleged violations of Section 13(a) and Rule 12b-20 and 13a-11 by signing and furnishing the Belize Announcement on Form 8-K.

Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 require every issuer of registered securities to file with the SEC annual reports on Form 10-K, current

reports on Form 8-K, and quarterly reports on Form 10-Q. *See* 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a–1, 240.13a–11, 240.13a–13. In addition, Rule 12b-20 requires the issuer to disclose any material information as may be necessary to ensure that the reports are not misleading. 17 C.F.R. § 240.12b–20; *see Ponce v. SEC*, 345 F.3d 722, 735 (9th Cir. 2003). These reporting requirements "are satisfied only by the filing of complete, accurate, and timely reports." *SEC v. IMC Int'l, Inc.*, 384 F. Supp. 889, 893 (N.D. Tex. 1974), *aff'd mem.*, 505 F.2d 733 (5th Cir. 1974); *accord SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 87 (D.D.C. 2014). To prove a violation of Exchange Act Rules 12b–20, 13a–1, 13a–11, and 13a–13, the SEC must establish that Treaty's filings at issue were materially false. *See SEC v. Stanard*, No. 06 Civ. 7736(GEL), 2009 WL 196023, at *31 (S.D.N.Y Jan. 27, 2009) (citing 17 C.F.R. § 240.12b–20; *SEC v. Koenig*, No. 71-5016, 1972 WL 329, at *6 (S.D.N.Y. June 20, 1972)).

Section 20(e) of the Exchange Act authorizes the SEC to bring claims for aiding and abetting primary violations of the federal securities laws. 15 U.S.C. § 78t(e). To demonstrate aider and abettor liability for a Section 13 violation, the SEC must prove: (1) that Treaty violated Section 13(a); (2) that the Officer Defendants had "general awareness" of their role in the violation; and (3) that the Officer Defendants knowingly rendered "substantial assistance" in furtherance of Treaty's violation of Section 13(a). *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 621 (5th Cir. 1993); *see also SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011); *SEC v. Shapiro*, No. 05-364, 2008 WL 819945, at *7 (E.D. Tex. Mar. 25, 2008). Underlying the second and third elements "is a single scienter requirement that varies on a sliding scale from 'recklessness' to

'conscious intent.'" *Abbott*, 2 F.3d at 621. Generally, the plaintiff must show conscious intent. *Id.* However, if there is a "special duty of disclosure" or "evidence that the assistance to the violator was unusual in character and degree," then a recklessness standard applies. *Id.*

As explained above, Treaty (via Reid and Gwyn) violated Section 13(a) and Rule 12b-20 by failing to disclose Blackburn's involvement with Treaty on its 2012 Form 10-K.[197] Reid and Gwyn admitted that they knew the report used generic terms, such as "affiliate," to refer to Blackburn.[198] Further, they knowingly rendered substantial assistance to the violation because they provided the certifications necessary for the report to be filed, attesting that the report was complete and truthful.[199]

However, the SEC has failed to establish that Blackburn aided and abetted this reporting violation. While it claims that he did so by mandating that the other Officer Defendants not disclose his involvement in Treaty, it provides no evidence of him making any statement to that effect; Blackburn refusing to become an officer is not the same as him directing the others to not disclose his involvement.

Further, the SEC has failed to establish that Mulshine aided and abetted a Section 13(a) violation by Treaty, as it has failed to establish that he acted with the requisite degree of scienter. *See Abbott*, 2 F.3d at 621.

V.  **EXCHANGE ACT RULE 13A-14**

---

[197] *See supra* Part III.A.
[198] (Rec. Doc. 182-18, at 50-53).
[199] (Treaty 2012 Form 10-K, Rec. Doc. 182-15, at 12, 14-17).

The SEC argues Reid and Gwyn violated Exchange Act Rule 13a-14 by signing certifications related to Forms 10-K and 10-Q that failed to disclose Blackburn's control of Treaty. Rule 13a-14 provides that each report filed on a Form 10-K or Form 10-Q must include certifications in the form specified in the applicable exhibit filing requirements of such report and each principal executive and principal financial officer of the issuer must sign a certification. 17 C.F.R. § 240.13a-14. The certification must state that "[b]ased on [the certifying individual's] knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report." 15 U.S.C. § 7241(a)(1), (2), (3).

As explained above, Reid and Gwyn failed to disclose Blackburn's significant involvement in the management of Treaty on its 2012 Form 10-K,[200] thereby violating Rule 13a-14. Accordingly, the SEC is entitled to summary judgment on this claim. *See SEC v. Indigenous Glob. Dev. Corp.*, No. 06-05600JCS, 2008 WL 8853722, at *15 (N.D. Cal. June 30, 2008), *aff'd*, 402 F. App'x 250 (9th Cir. 2010).

## VI.    EXCHANGE ACT SECTION 16(A)

The SEC asserts that Blackburn and Gwyn violated Exchange Act Section 16(a) and Rule 16a-3 thereunder by not making any required filings on Forms 3, 4, or 5 regarding their ownership of Treaty stock. The SEC further argues that Reid failed to file the requisite forms disclosing additional acquisitions of Treaty stock

---

[200] *See supra* Part III.A.

acquired after 2011, did not file the requisite forms disclosing his beneficial ownership of Treaty stock through affiliated entities, and failed to file Forms 4 when he disposed of shares.

Section 16(a) of the Exchange Act provides that "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security," must file ownership statements with the SEC. 15 U.S.C. § 78p(a); *see e-Smart Techs.*, 31 F. Supp. 3d at 103. Rule 16a-3 provides than an initial statement must be made on Form 3, subsequent statements of changes in beneficial ownership must be made on Form 4, and annual statements must be made on Form 5. 17 C.F.R. § 240.16a-3. To establish a violation of Section 16(a), the SEC must prove that a defendant (1) was subject to the disclosure requirements of Section 16(a); (2) had a beneficial change in ownership; (3) did not file a Form 4 or 5 disclosing that change in beneficial ownership; and (4) the failure to do so was not inadvertent. *SEC v. Blackwell*, 477 F. Supp. 2d 891, 905 (S.D. Ohio 2007).

During the relevant period, Reid was the CEO of Treaty and chairman of its Board of Directors,[201] and Gwyn was the co-CEO and later COO, as well as a director.[202] For purposes of Section 16, Blackburn may also be considered an officer because he performed duties analogous to those of an officer; as explained above, these duties included hiring or appointing Treaty's officers and directors, including

---

[201] (Rec. Doc. 182-18, at 62).
[202] *Id.* at 66.

Reid and Mulshine, led Treaty's acquisition and fundraising efforts, used personal assets to raise funds for Treaty, and actively managed the Belize Venture.[203] *See SEC v. Solucorp Indus., Inc.*, 274 F. Supp. 2d 379, 420 (S.D.N.Y. 2003) (finding purported consultant to be de facto officer for purposes of Section 16(a)).

Blackburn received over 397 million shares at Treaty's inception, an 86.4% interest, then issued a significant number of these to investors and was issued additional shares from Treaty, which he also sold; the SEC estimates that Blackburn distributed at least 380 million shares in this fashion.[204] He also never filed any of Forms 3, 4, or 5 regarding his ownership of Treaty stock.[205] The repeated nature of the violations evidences Blackburn's complete disregard for these reporting requirements and establishes that the violations were not inadvertent. Thus, the SEC has established that Blackburn violated Section 16(a) and Rule 16a-3.

However, the SEC has failed to establish that Gwyn and Reid violated Section 16(a) because it has failed to identify record evidence that satisfies the remaining elements.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the SEC's *Motion for Summary Judgment* **(Rec. Doc. 182)** is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to the SEC's claims under Section 5 of the Securities Act against all

---

[203] *See supra* Part III.A.
[204] (Hunter Decl., Rec. Doc. 182-8, at 15, 17-18; Blackburn Tr., Rec. Doc. 182-10, at 130).
[205] (Rec. Doc. 182-18, at 39).

of the Officer Defendants, its claims under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 against Reid, Gwyn, and Mulshine, its claims under Section 13(a) of the Exchange Act and Exchange Act Rule 13a-14 against Reid and Gwyn, and its claim under Section 16(a) of the Exchange Act and Exchange Act Rule 16a-3 against Blackburn. The Motion is **DENIED** as to all other claims.

**IT IS FURTHER ORDERED** that the SEC's *Motion to Strike* **(Rec. Doc. 204)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Blackburn, Reid, Gwyn, and Mulshine's *Motion for Summary Judgment* **(Rec. Doc. 197)** is **DENIED**.

**IT IS FURTHER ORDERED** that the SEC shall submit a brief to the Court on the appropriate remedies to be imposed against each Defendant as a result of their violations within 21 days of this Order.

New Orleans, Louisiana this 17th day of December, 2019.

_____

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE